849 So.2d 1114 (2003)
F.L., The Mother, Appellant,
v.
DEPARTMENT OF CHILDREN AND FAMILIES, Appellee.
No. 4D02-4396.
District Court of Appeal of Florida, Fourth District.
July 3, 2003.
Rehearing Denied August 7, 2003.
*1116 Felicia Shaman of Law Office of Felicia Shaman, P.A., Fort Lauderdale, for appellant.
No brief filed on behalf of appellee.
WARNER, J.
A mother, F.L., appeals the trial court's order terminating her parental rights to her seventh child. The trial court terminated her rights under sections 39.806(1)(c) and (i), Florida Statutes (2001). We hold that the Department of Children and Families ("DCF") failed to prove grounds for termination as authorized under section 39.806(1)(c). We further hold that section 39.806(1)(i), allowing for termination solely upon a showing that a parent's right to a prior child was terminated involuntarily, unconstitutionally shifts the burden to the parent to prove reunification would not be harmful to the child. We therefore reverse.
F.L. grew up in an abusive home, with a mother in prison and a father who abused substances and was physically abusive to F.L. By the time F.L. was in her late teens, she had three children and was in an abusive relationship with C.N., Sr.
In October 1997, DCF filed a petition for dependency as to F.L.'s first three children, C.H., T.S. and C.N. DCF alleged that she was observed intoxicated in the presence of the minor children and had medically neglected T.S. and C.N. F.L. consented to the petition and entered into a case plan for reunification. The plan consisted of assessments, participation in a parenting course, successful completion of a substance abuse course, completion of a domestic violence program, and maintaining stable housing and income for six months.
While this dependency action was pending, in early 1998, F.L. prematurely gave birth to Y.L. DCF immediately took custody of this child and filed a petition for dependency based upon medical neglect, due to the child's low birth weight, and the allegations made in the prior petition for dependency of F.L.'s other children. The court declared Y.L. dependent and provided a case plan for reunification similar to F.L.'s prior plan.
A fifth child, F.N., was born at the end of 1998, and DCF also took custody of this child. In the petition for dependency, DCF alleged F.L. had a history of child abuse and neglect and "has been uncooperative with any service which were [sic] offered." A petition for termination of rights also was pending as to the other children based upon medical neglect. F.N. was adjudicated dependent and provided a case plan for reunification again consistent with the prior plans.
Subsequent to F.N.'s adjudication of dependency, F.L. executed a voluntary surrender and consent for adoption as to the first four children in December 1999. F.L. had never complied with any of the case plans for reunification with these four children. In April 2000, DCF moved to terminate F.L.'s parental rights as to F.N. based upon the prior allegations of medical neglect as well as F.L.'s failure to obtain Medicaid for F.N. after her birth, the presence of domestic violence between F.L. and C.N, Sr., and the failure to substantially comply with her case plan.
F.L. had her sixth child, Cl.N. in March 2000. DCF took this child into custody on grounds that the mother medically neglected *1117 the child by refusing medical services, as well as the allegations regarding the five prior children. After mediation, F.L. agreed to voluntarily surrender her rights to F.N., while DCF agreed to offer her a case plan for Cl.N. In December 2000, F.L.'s rights to Cl.N. were terminated based upon the court's determination under section 39.806(1)(c) that F.L. consistently failed to substantially comply with her case plans and her continued involvement in the parent-child relationship would threaten the child's welfare.
Finally, C.N., Jr., the child at issue in this case, was born in January 2002. At the time, the father, C.N., Sr., was incarcerated on drug charges. Unlike the prior cases, F.L. accepted and received home health services after C.N., Jr.'s birth. A counselor visited F.L.'s home several times and observed that F.L. was providing C.N., Jr. with appropriate care, including seeking proper medical care, and that F.L. and the child had emotionally bonded. The counselor saw no danger to C.N., Jr.
When DCF learned of C.N., Jr.'s birth, representatives sought to locate F.L., and enlisted the services of Broward County Sheriff's Office Child Care Investigation unit ("BSO"). An investigator located F.L. and C.N., Jr. and observed nothing to cause concern regarding F.L.'s care. F.L. was receiving services, and the investigator saw no reason to remove the child from her care until she learned of the involuntary termination of F.L.'s rights as to Cl.N. BSO office policy dictated that a child be removed where the parent has had a prior involuntary termination. Yet, the initial shelter petition was denied by the court, and C.N., Jr. was returned to F.L.
BSO then sent an investigator to visit F.L. and set up referrals for "in-home" services. He found F.L. cooperative, and the child appeared to be fine. Because F.L. said she was moving, he did not set up any services. However, he believed F.L. should keep the child, as she appeared to be loving and caring.
Although DCF originally filed a petition for dependency, within a short period, and without offering a case plan, the agency filed a petition for termination of parental rights in June 2002. It alleged, pursuant to section 39.806(1)(c), that F.L. failed to comply with prior case plans leading to the termination of her rights to the other children. As a second ground for termination, DCF alleged that F.L.'s rights to Cl.N. were involuntarily terminated and constituted a ground for termination under section 39.806(1)(i). In the meantime, the court removed C.N., Jr. from F.L.'s custody but allowed her to have supervised visitation with the child.
At the final hearing in October 2002, DCF relied primarily on a service counselor, who had recently taken over F.L.'s files, to demonstrate the grounds for termination. Based upon those files, she testified that F.L. did not comply with any of her previous plans, outlining all of the tasks that F.L. failed to complete. However, the counselor admitted that DCF relied solely on F.L.'s history and not on any new allegations of neglect relating to C.N., Jr. In fact, she conceded that F.L. had made several efforts to improve herself and her ability to parent C.N., Jr., which she had not done with the other children. Nevertheless, she considered that F.L.'s efforts were insufficient and that her circumstances had not dramatically changed to ensure the safety of C.N., Jr., particularly because F.L. was still involved with C.N., Sr., and domestic violence was still a threat.
The counselor's opinion was consistent with the guardian ad litem who had been the guardian for several of F.L.'s other children. During direct examination she *1118 opined that F.L. could not provide a safe, nurturing environment for C.N., Jr. based upon her prior failure to parent her other children. However, on cross-examination, she admitted that she had seen changes in F.L. with C.N., Jr. and that F.L. and the child had bonded. During her visits the guardian found F.L.'s house clean and C.N., Jr., healthy. In fact, she had first recommended that DCF offer F.L. a case plan for reunification. She only changed her mind after meeting with the program's attorney, reviewing the file, and recognizing F.L. had made similar promises to change with respect to Cl.N. but had failed to follow through.
The BSO investigators, the initial DCF counselor assigned to F.L., and F.L.'s aunt all testified that F.L. and the child had bonded, that the home was clean, and that F.L.'s care of C.N., Jr. was appropriate. The counselor assisted in the visitation sessions between F.L. and C.N., Jr. and observed appropriate behavior and responses. The mother seemed genuinely concerned for her baby. On occasion, F.L. brought food and clothing for C.N., Jr. to assist his foster parents.
There were some concerns, such as the baby's sleeping quarters and the inability of the counselor to finish a home study because F.L.'s sister, with whom she resided, did not provide a social security number. However, when DCF decided to petition for termination of parental rights, none of these concerns were pursued, nor were other referrals for services provided.
While DCF did not offer a case plan for reunification, F.L. pursued courses on her own. With a counselor from Keeping Families Together, F.L. worked on parenting skills. The counselor administered a parenting inventory and scored F.L. within normal limits in all categories except "power and independence" where her score was low. In all, the counselor had twenty sessions with the mother focusing on parenting skills, as well as independence issues. At trial, DCF representatives did not consider this sufficient because F.L.'s prior case plans required her to complete a thirty-six week parenting course.[1]
In addition, F.L.'s attorney referred her to a substance abuse evaluation. Based upon F.L.'s self-reporting of her history, the therapist concluded that F.L. was not chemically dependent and did not recommend any further drug or alcohol treatment. After this initial evaluation, the therapist received additional information relating to F.L.'s history with DCF, her other children, and their fathers' drug and alcohol abuse, which was inconsistent with some of F.L.'s self-reported history. Nevertheless, the therapist did not alter her recommendation but rather indicated that she would need to make another assessment with the "new" information available.
F.L.'s previous plans also required her to obtain domestic violence counseling, which she did not get in the past. After the termination was filed in this case, she began attending counseling sessions for domestic violence. Because DCF was seeking termination, it did not make additional referrals; thus, F.L. arranged to attend the sessions herself. While she attended only three of six scheduled, the counselor found her to be proactive and eager to be a good mother.
On her own, F.L. also attended and completed a program designed to eliminate the need for supervised visitation. While in the program F.L. did not miss, and was not late for, any scheduled supervised visits *1119 with C.N., Jr. Upon completion of the program, she missed two scheduled visits the month preceding the hearing. However, the program coordinator testified that F.L. demonstrated she knew how to care for, and handle, the infant. Thus, the coordinator recommended that F.L. have unsupervised visitation.
Although the evidence showed many efforts of F.L. to establish her parenting abilities, there were also failings. She did not submit to a hair follicle drug test as agreed and was not completely forthcoming with the substance abuse therapist. In the month before the termination hearing, she missed several appointments for counseling and visitation. Also, about a month before the hearing, police were dispatched to her apartment and found C.N., Sr., recently discharged from prison, and F.L. arguing. The responding officer testified that he did not observe an incident of physical abuse but merely an argument and that F.L. lied about her name and stated to him that C.N., Sr. lived there. While F.L. admitted lying about her name, she denied telling the officer that C.N., Sr. lived at her apartment. The court found the officer credible. DCF presented no evidence that there were any incidents of domestic abuse in the presence of any of the children.
In her testimony, F.L. explained her prior failure to complete case plans was due to a lack of support, depression, and belief that she could not complete the tasks. With the support she has received, her attitude has changed and she indicated she wanted to be a good mother to C.N., Jr. At the time of the hearing, she had lived on her own for four months and had a part-time job, and she expressed a willingness to participate in any services in order to maintain this environment and be reunified with her child.
The trial court concluded that DCF had proved its case for termination in accordance with both sections 39.806(1)(c) and (i). It noted that F.L.'s rights were terminated to her six other children due to her failure to comply with court-ordered case plan tasks. It found,
While the mother professed the desire to be a parent, her actions indicated otherwise. The mother made a minimal effort prior to the hearing to avoid the termination of her parental rights, but even then she missed appointments, stopped going to sessions, failed to reschedule and follow through.
The mother failed to come forward with evidence that the circumstances or pattern of conduct that led to the involuntary termination of her parental rights to the other child cannot serve as a predictor of her conduct with this child. A.B. v. Department of Children and Families, 816 So.2d 684 (Fla. 5th DCA 2002). The mother's actions and inactions demonstrated a continued unwillingness and inability on her part to parent her child.
The court found that it was in the best interests to terminate F.L.'s rights in that: (1) there was no substitute arrangement with a known relative; (2) "[t]he mother [and father, whose rights were also terminated] do not have the capacity to care for the child to the extent that the child's safety, well-being, physical, mental and emotional health could not be endangered upon the child's return home;" (3) the mother and father do not have the ability and disposition to provide the child with food, clothing, medical care or other remedial care; (4) the child's mental and physical needs are currently being met by the custodians; (5) although some harm may occur as a result of termination, there would be greater harm if the parents' rights were not terminated; and (6) the *1120 child is adoptable. The court therefore terminated F.L.'s rights, prompting this appeal.
It is well settled that a parent has a fundamental liberty interest in the care, custody and management of his/her child. See Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); State ex rel. Sparks v. Reeves, 97 So.2d 18, 20 (Fla.1957). In order to terminate a parent's rights to a child, DCF must present clear and convincing evidence that a ground for termination under section 39.806(1) exists and that reunification poses a significant risk of harm to the child. See In re Adoption of Baby E.A.W., 658 So.2d 961, 967 (Fla.1995). In Padgett v. Department of Health & Rehabilitative Services, 577 So.2d 565, 571 (Fla.1991), the court held that under appropriate circumstances the "termination of a parent's rights in one child under circumstances involving abuse or neglect may serve as grounds for permanently severing the parent's rights in a different child." (Footnote omitted). In an important caveat, the court said:
We note that because parental rights constitute a fundamental liberty interest, the state must establish in each case that termination of those rights is the least restrictive means of protecting the child from serious harm. This means that HRS ordinarily must show that it has made a good faith effort to rehabilitate the parent and reunite the family, such as through a current performance agreement or other such plan for the present child.
Id. Justice Barkett, in her concurring opinion noted "[t]ermination of parental rights should be the remedy of last resort, employed only when other reasonable alternatives have been exhausted." Id. at 572.
Where DCF is petitioning to terminate parental rights on the basis of abuse or neglect of another child, we have emphasized that the state must show that "the behavior of the parent was beyond the parent's control, likely to continue, and place the child at risk." A.C. v. Dep't of Children & Families, 798 So.2d 32, 35 (Fla. 4th DCA 2001) (quoting Gaines v. Dep't of Children & Families, 711 So.2d 190, 193 (Fla. 5th DCA 1998)). In Gaines, the court gave examples of such behavior as pedophilia, drug addiction, or mental illness. See 711 So.2d at 193. These types of behavior are the type that could constitute harm to the child and may not be amenable to treatment.
In this case, DCF sought and obtained termination of F.L.'s rights under sections 39.806(1)(c) and (i). We conclude that it failed to prove the requirements to terminate under section 39.806(1)(c) and that section 39.806(1)(i) is facially unconstitutional.
Section 39.806(1)(c) provides for termination,
When the parent or parents engaged in conduct toward the child or toward other children that demonstrates that the continuing involvement of the parent or parents in the parent-child relationship threatens the life, safety, well-being, or physical, mental, or emotional health of the child irrespective of the provision of services. Provision of services may be evidenced by proof that services were provided through a previous plan or offered as a case plan from a child welfare agency.
"To terminate parental rights under this section, the trial court must find that the child's life, safety, well-being, or physical, mental, or emotional health would be threatened by continued interaction with the parent regardless of any services provided to the parent." In re J.D.C., 819 So.2d 264, 266-67 (Fla. 2d DCA 2002) (citing *1121 R.W.W. v. Dep't of Children & Families, 788 So.2d 1020, 1023 (Fla. 2d DCA 2001)).
In R.W.W., the trial court terminated a mother's rights when, at the child's birth, the mother and child tested positive for cocaine. See 788 So.2d at 1023. Within a week after the child's birth, the mother was arrested for possession of cocaine. DCF petitioned for termination of parental rights, refusing to offer a case plan for reunification. Although the mother stated at the hearing that she was seeking drug treatment so that she could raise her child, the trial court doubted her sincerity and found that the child would be in danger. See id. The second district concluded the evidence was insufficient to terminate the mother's parental rights under section 39.806(1)(c) where DCF failed to establish the mother's continual involvement with the child threatened her life, safety, or health regardless of the provision of services to the mother. See id. at 1024. The court explained that to terminate pursuant to that section "the trial court must find that any provision of services would be futile or that the child would be threatened with harm despite any services provided to the parent." Id. at 1023. The second district cited the mother's willingness to arrange for drug treatment upon her release from jail as well as the use of other jail services to assist in securing employment and housing as evidence that the mother was amenable to treatment and that DCF had failed to demonstrate services were futile. See id. at 1024.
In L.B. v. Department of Children & Families, 835 So.2d 1189, 1193 (Fla. 1st DCA 2002), the mother suffered from depression and anger management issues. She had an explosive relationship with her children's father, leading to domestic violence against him. After her children were declared dependent, she was given a case plan with specific tasks. She was compliant with some tasks and attended counseling sessions. However, while working on some of her tasks, she assaulted the father with her car. See id. at 1191. Based upon her failure to comply with all of the case plan as well as her continuing problems with anger management, the trial court terminated her parental rights, citing section 39.806(1)(c). See id. at 1193. The first district reversed, concluding that even though the experts testified the mother could be a danger, she presented evidence that she was consistently taking her medication and working successfully on various tasks. See id. at 1194. As to the possibility of prospective abuse on the child, the court also distinguished the mother's case from cases in which the parents are so afflicted they could never be cured of the affliction that constituted the danger to the child, such as pedophilia. See id. at 1195 (relying upon Palmer v. Dep't of Health & Rehab. Servs., 547 So.2d 981, 984 (Fla. 5th DCA 1989)). In order to terminate under section 39.806(1)(c), DCF must prove that there is no reasonable basis for improvement in the parent and that the continued involvement of the parent would be harmful to the child. Because the testimony showed that the mother was making some improvement and completing some tasks, DCF failed to prove that the provision of services would be futile. See L.B., 835 So.2d at 1195.
This case is similar to the foregoing cases. While in this case F.L. had not abided by any of her previous case plans, DCF failed to prove that regardless of the provision of services, F.L.'s continued involvement as a parent to C.N., Jr. would threaten his well-being. The original allegations against F.L. consisted of her being intoxicated around her children sometime in 1997 and medical neglect of a congenital condition. F.L. was also accused of medical *1122 neglect of Y.L., F.N., and Cl.N. As to C.N., Jr., not only was there no allegation of medical neglect, but the undisputed evidence showed that F.L. had provided all appropriate medical care to C.N., Jr. Before DCF became involved, F.L. had taken the baby to the pediatrician, made sure he was properly immunized, and even noticed diaper rash on him when he was not in her custody. She also had adequate food, formula, and clothing for the baby. These were actions that F.L. never took with her other children. Therefore, DCF did not prove that C.N., Jr., would be medically neglected irrespective of the provision of services. As to the intoxication, there was no evidence presented that the mother abused illegal substances or alcohol. The only evidence DCF presented was the single incident where she was intoxicated around her other children. This was insufficient to show that her continuing involvement with C.N., Jr., would create harm to him. While she failed to attend programs on substance abuse required under the prior case plans, after an evaluation by a substance abuse therapist, the therapist concluded that she was not an abuser and that treatment was unnecessary. Although DCF suggested the therapist did not have all the correct information, there was still no evidence that F.L. abused substances or that she would be harmful to her child as a result. At the very least, no evidence supported the finding she would be a continued danger to her child irrespective of the provision of services.
Despite DCF's refusal to offer her a case plan, the mother actively sought services to improve herself, something she had never done with the prior children. She attended several programs, and her counselors and therapists all believed that she was making a sincere and able effort to learn to parent correctly. Although the trial court considered this "too little too late," in the past she had never even started any programs or services. This time she did them on her own without assistance from DCF. Because there was evidence that F.L. had in fact improved her parenting skills with the provision of services, DCF failed to prove by clear and convincing evidence that any efforts would be futile to terminate F.L.'s rights pursuant to section 39.806(1)(c).
The court also found that DCF proved the termination of F.L.'s rights under section 39.806(1)(i), which section allows for termination when the parent's rights to another child have been involuntarily terminated. Because her rights to Cl.N. were involuntarily terminated, the court shifted the burden to the mother to show her conduct that caused the termination of her parental rights as to Cl.N. would not serve as a predictor of her conduct with C.N., Jr. Finding that she had not satisfied that burden, the court terminated her rights. F.L. contends that the statute is facially unconstitutional in that it shifts DCF's responsibility to prove the elements necessary to terminate a parent's fundamental right to parent to the parent. We agree.
As the Padgett court stated in a case involving termination of parental rights based upon the termination of the parent's rights as to other children, "[t]o protect the right of the parent and child, we conclude that before parental rights in a child can be permanently and involuntarily severed, the state must show by clear and convincing evidence that reunification with the parent poses a substantial risk of significant harm to the child." 577 So.2d at 571 (emphasis added) (footnote omitted). Thus, DCF carries the burden not only to establish a ground for termination but the continuing substantial risk of harm to the current child.
*1123 In A.B. v. Department of Children & Families, 816 So.2d 684, 685 (Fla. 5th DCA 2002), where a mother challenged the constitutionality of the statute, the Department argued that section 39.806(1)(i) was simply a codification of the holding of Padgett. In upholding the statute, the fifth district attempted to reconcile the statute with Padgett by stating:
[A] parent whose rights have been involuntarily terminated as to one child may avoid termination as to another child if he or she comes forward with evidence that the circumstances or pattern of conduct that led to termination of parental rights to the other child cannot serve as a predictor of his or her conduct with the child at issue. In light of the supreme court's opinion in Padgett in this context, the statute is constitutional.
Id. at 686. We think that by shifting the burden to the mother to show that her past conduct does not serve as a predictor of current conduct, the court has relieved the state of its burden of demonstrating that reunification with the current child poses a substantial risk of harm. All the state has to do, according to A.B., is to show the mother's past conduct. It then becomes the duty of the mother to show that her past conduct does not predict that the current child is at substantial risk. This is contrary to Padgett's express holding. See 577 So.2d at 571.
In C.W. v. Department of Children & Families, 814 So.2d 488 (Fla. 1st DCA 2002), the mother's rights to her youngest child were terminated based upon the severe abuse by the mother's boyfriend to her other children and the mother's failure to protect her child. One child was burned and sustained severe injuries to his internal organs. The mother was charged with child neglect. Six months later, when the mother gave birth to another child, DCF removed the child from her custody and sought to terminate the mother's rights based upon the termination of her rights to the other children. See id. at 493-94 (Ervin, J., dissenting). Even though the guardian and a Child Protection Team psychologist recommended against termination, the trial court granted termination solely upon the evidence of the conduct with the prior children, finding that the mother had failed to prevent egregious conduct which had threatened the very life of her other children. See id. at 492. The first district affirmed the termination.
Judge Ervin wrote a thoughtful dissent, noting that the DCF failed to present any evidence "reasonably showing that the mother's prior conduct with her former children placed the fifth child at risk." Id. at 495. He noted that the court had ignored all of the evidence of the mother's current conduct with the child and the mother's changed attitude. DCF offered no evidence that the mother's present condition or actions placed the child at risk with the mother but instead relied entirely on the mother's prior conduct with her other children. See id. He wondered:
[W]hether the Department's position would be the same if five years had elapsed from the date of the mother's earlier egregious conduct and K.L.B., Jr.'s birth, yet the interpretation the court below and the Department placed on the statute appears not to make the passage of time a significant factor in deciding whether termination is appropriate. In my judgment, if the pertinent provisions of section 39.806 are permitted to survive constitutional muster, they must be given a far more restrictive construction than the majority places on them in the present case.
Id. After reviewing Padgett and other pertinent authority, he concluded:

*1124 If section 39.806 can be interpreted as permitting "the heavy hand of government paternalism," Padgett, 577 So.2d at 570, to be stretched out at any time to remove a child from its parent's custody, based solely on the parent's past conduct, without any regard for present circumstances, such a construction, in my judgment would violate the fundamental liberty interest of the natural parent in the care, custody, and management of his or her child. The interpretation the Department advanced ignores empirical evidence, as presented in this case, that human beings have the ability to change, and that even parents deemed unfit because of their past actions to raise certain of their children deserve a second chance at raising others.
Id. at 496. We agree with the sentiments of Judge Ervin and conclude, contrary to A.B., that the statute is facially unconstitutional where it permits termination of parental rights solely upon the involuntary termination of rights to another child. To pass constitutional muster Padgett requires the state to prove that reunification with the current child would pose substantial risk to the child. See 577 So.2d at 571. The statute, as construed by A.B., relieves the state of this burden and shifts to the parent the burden of showing that current conditions are unlike those of the past and that reunification will not pose a substantial risk of harm to the child. Because the trial court relied on A.B. and shifted the burden to the mother, its decision did not satisfy the constitutional requirements of Padgett.
DCF has not proved reunification will pose a substantial risk to C.N., Jr. or that the provision of services to F.L. would be futile in permitting reunification. For the foregoing reasons, we reverse the final judgment terminating parental rights and remand for further proceedings. We certify conflict with A.B. as we have held section 39.806(1)(i) is facially unconstitutional, thus, inviting supreme court review. The power and authority of DCF to seek termination of parental rights is a significant and continuing problem in this state. DCF should neither be too slow to protect our precious children, nor too quick to terminate a parent's fundamental right to raise his or her child. The proper construction of its duties and responsibilities under these statutes is a matter of vital importance to the families of this state.
POLEN and GROSS, JJ., concur.
NOTES
[1] There were not thirty-six weeks from the time the termination petition was filed until the final hearing.