866 So.2d 81 (2004)
J.F., the Mother, Appellant,
v.
DEPARTMENT OF CHILDREN AND FAMILIES, Appellee.
No. 4D02-4225.
District Court of Appeal of Florida, Fourth District.
January 7, 2004.
Rehearing Denied March 10, 2004.
*82 Denise E. Kistner of the Law Offices of Denise E. Kistner, P.A., Fort Lauderdale, for appellant.
Charles J. Crist, Jr., Attorney General, Tallahassee, and Laurel R. Wiley, Assistant Attorney General, Fort Lauderdale, for appellee.
STEVENSON, J.
In this appeal, the mother, J.F., argues that the Department of Children and Families (Department) failed to present clear and convincing evidence to support the termination of her parental rights to two children, a son and daughter.[1] We agree and reverse.
J.F.-1 was born on January 8, 1993. The Department filed a shelter petition on June 21, 1993, as to J.F.-1, alleging that the mother's step-child, S.F., was physically abused and died while in her care as the result of a blunt trauma to the stomach. The trial court granted the petition and sheltered J.F.-1. Later, as a result of the allegations, J.F.-1 was adjudicated dependent *83 in October 1993 and placed in the custody of his maternal aunt and uncle under the protective supervision of the Department.
The mother was convicted on April 16, 1996, of manslaughter and child abuse for the killing of S.F. Attempts were made to reunite J.F.-1 with his father, J.F., Sr., but plans to reunite the child with the mother were put on hold pending her release from prison. The placement of J.F.-1 with his father broke down in August 1998, and he was ultimately removed from his custody. The trial court entered a no contact order as to both the mother and father, accepted a new case plan goal of long-term relative placement, and placed J.F.-1 with his maternal grandmother. The new case plan reflected that the mother was still incarcerated.
Both parties disagree as to whether the mother was a party to the August 1998 case plan, and the record in this respect is unclear; however, both agree that the mother was offered a case plan upon her release from prison on January 27, 1999, which had to be completed before she could have contact with J.F.-1. The case plan required that the mother attend parenting classes, maintain stable employment and residence, and participate in psychological evaluation, family and individual counseling. The court accepted the case plan and ordered that the mother attend psychological evaluations to determine specific treatment needs; the goal remained long-term relative placement, and the mother was not allowed to visit or have contact with J.F.-1.
Subsequent judicial reviews reveal that the mother completed requirements to obtain her G.E.D., attended parenting classes while in prison, and completed the court-ordered psychological evaluation. The psychological evaluation recommended that the mother receive a neuropsychological evaluation, weekly individual therapy with a licensed mental health professional experienced with working with violent offenders, individualized parent training sessions, and no contact with J.F., Sr., or J.F.-1, unless therapeutically indicated by his counselor.
The Department later reported that the mother "appears to be motivated to comply with her court ordered tasks," "has made tremendous efforts to attend and find services that would meet the court[']s requirements," and "has proven to be quite motivated to regain visitation and possibly custody of her son." The mother also received an appointment for neuropsychological evaluation and actively participated in and attended intensive parenting classes at New Dimensions Family Services.
Subsequently, the Department had problems finding the appropriate persons to make a referral for the mother to participate in individualized and family therapy. She was referred to several programs, but was unable to complete them because she was either excluded because of her manslaughter conviction, was not medicaid eligible, or the program closed before she could complete counseling. The Department informed the court that it was still attempting to locate counseling services for the mother.
The mother completed the neuropsychological study in February 2001, which reported that
Results suggest that [the mother] is capable of reestablishing a relationship with her child [J.F.-1]. There is no evidence of neuropsychological impairment that would cause her to be dangerous to her children.
Her two other children currently reside in her home and no problems have been reported.

*84 The client has eagerly pursued completion of all court-ordered requirements and is motivated to reunify her family.
Nevertheless, the report determined that visitation between the mother and J.F.-1 was not therapeutically recommended at the time and that the mother should receive a psychological evaluation to obtain outside information history and perspective.
Following this recommendation, the Department filed a motion for "new psychological evaluation" of the mother. J.F.-1's counselors also believed that visitation with J.F.-1 was not advisable until the mother completed the psychological evaluation because the neuropsychological evaluation expressed concerns about her ability to safely and appropriately parent and "a pervasive unwillingness to admit even minor character flaws." They also believed that the mother provided inaccurate case history to the evaluation team, acknowledged little remorse or involvement in the death of S.F., and was defensive and at times reluctant to cooperate with testing. J.F.-1's counselors expressed concerns about the mother's contact with J.F., Sr., since he was not currently under a case plan. The mother agreed and the court entered an order for the new psychological evaluation.
During the pendency of the proceedings, the mother gave birth to another child, J.F.-2, in June 2000. The Department alleged that the child was required to be sheltered due to S.F.'s death in 1993. The dependency petition, however, was not filed until November 2001 because the Department had difficulties locating the child and the mother refused to reveal her whereabouts. It was not until February 2002, a year and three months after J.F.-2 was born, that the Department was able to locate and shelter the child. J.F.-2 was placed in the custody of a non-relative friend of the mother under protective supervision. By all accounts, J.F.-2 looked well taken care of when she was sheltered; she had no marks, burns or other signs of abuse.
The mother entered a denial to the petition for adjudication of dependency as to J.F.-2, and the court granted her supervised visitation. Later, the Department filed a case plan stating adoption as its goal. On March 27, 2002, the Department filed a petition to terminate the mother's parental rights; however, the Department entered into mediation with the mother, which required that J.F.-1 remain with the maternal grandmother and the mother receive individualized counseling.
In March 2002, when the Department filed its petition for termination of parental rights, the mother still had not completed individual or family counseling, though the case plan had been signed some three years earlier. The record reflects that any failure to complete the counseling was not the fault of the mother as it was she who found, scheduled and paid for individual counseling for herself in March 2002. Nor does it appear from the record that the "new psychological evaluation" ordered by the court had been completed. On August 22, 2002, the Department filed an amended petition for termination of parental rights and permanent commitment of the minor children.
At the termination proceedings conducted in September 2002, the mother related the 1993 incident that resulted in S.F.'s death. She admitted to spanking the child on her bottom with some type of stick or rod, but denied kicking her. The State called several witnesses to establish that S.F.'s injuries were consistent with being severely abused.
The Department's expert, who testified as to why the mother's rights should be terminated, explained that she has a law *85 degree, but took several courses while working with the Department to assess risk. The Department uses a written risk assessment tool, which looks at several different social variables to determine whether a child is at risk in a particular circumstance. Regarding reuniting the mother and the children, the Department's expert stated:
I am very concerned about any child being with [the mother] at this point in time because in my meetings with [her] I have not seen that she has been interested in taking responsibility for ... [S.F.'s] death.

. . . .
She wanted the past to be in the past. She said that she was not interested in how this child died; that that has all been rehashed. She paid the price for it and that is it.
And that absolutely terrifies me because a child who was in her care died and she was found guilty of causing that child's death.
And she wants to put it in the past. She does not want to deal with it. She has not gotten long-term therapy.
I have seen her become very, very angry at several different people. She is not good at containing her anger for any length of time.
And I just don't see that there has been any intervention between the time that [S.F.] was killed and now, and my concern is particularly for a child who is at an age and with a disposition that may make [the mother] angry and what [her] actions could be.
The guardian ad litem expressed the same sentiments, at first stating that she believed the mother completed her punishment for the crime and should be given a chance to at least be a part of the children's lives. Ultimately, she agreed that the mother's parental rights should be terminated because the mother failed to take responsibility for the death of her stepchild and she fears that the incident could reoccur.
The mother's case worker who had been working with her since November 2000 expressed that he did not believe the mother could provide a safe environment because she "physically assaulted" him several times over the phone. He did not, however, specify when the assaults occurred, the circumstances under which they occurred, or give examples of what he deemed to be a physical assault.
Both the Department's expert and the case worker admitted that the mother completed all the tasks outlined in her case plan, with the exception of the individual counseling, which the Department had problems scheduling and the mother ended up paying for herself. When the mother ultimately began counseling, her therapist worked with both her and J.F.-1 to reestablish visitation. In July 2002, two months before the termination proceedings commenced, the therapist recommended and the court ordered supervised visits between J.F.-1 and the mother. The mother had continued to visit regularly with J.F.-2 since she was sheltered, which, according to the mother's case worker, went well.
The mother's case worker believed that J.F.-1, did not have a bond with the mother because of the no contact order that had been in place since the mother's release from prison. However, the Department's expert described the mother's court-ordered visit with J.F.-1 in August 2002 as "demonstratively affectionate." "[I]t wasn't like two strangers. They were very familiar with each other, and they just sat and talked and colored." The mother knew a lot about J.F.-1's life, she knew *86 about his football coach, the kids on his team, "all kinds of things," stated the expert. In regards to J.F.-2, the Department's witnesses believed that, overall, the mother had a bond with J.F.-2.
The mother testified that the individual and group counseling she had been receiving was helping her tremendously and, through the counseling, she has learned that it is permissible for her to get angry in a way that is not harmful to others. She expressed remorse, reluctantly accepted some blame for the death of S.F., and stated that the incident had impacted her life greatly. She also expressed frustration over being separated from her children and stated that she was no longer involved with J.F., Sr. She continues to financially support her children, which she has done since being granted work-release in 1997.
The trial court granted the petition to terminate the mother's parental rights, concluding that the mother failed to take responsibility for S.F.'s death; had received long-term therapy and still had an anger management problem; and failed to substantially complete the case plan. It further "reject[ed]" the argument that the mother could parent the children because she safely parented J.F.-2 for one year and three months, stating that it is easy to parent a child J.F.-2's age.
In this case, the Department has the burden of presenting clear and convincing evidence of the grounds under section 39.806(1), Florida Statutes (2002), for terminating parental rights and evidence that reunification poses a significant risk of harm to the child. See N.L. v. Dep't of Children & Family Servs., 843 So.2d 996, 999 (Fla. 1st DCA 2003). The evidence must be credible; the memories of the witnesses must be clear and without confusion; and the sum total of the evidence must be of sufficient weight to convince the trier of fact without hesitancy. See R.S. v. Dep't of Children & Families, 831 So.2d 1275 (Fla. 4th DCA 2002). A finding that evidence is clear and convincing enjoys a presumption of correctness and will not be overturned on appeal unless clearly erroneous or lacking in evidentiary support. See id.
In its amended petition, the Department moved to terminate the mother's parental rights on four grounds under section 39.806(1): subsection (c), the continuing involvement of the parent with the children threatens their life, safety and well-being, irrespective of the services offered; subsection (e), failure to substantially comply with the case plan for a period of twelve months after an adjudication of the child as dependent or placement in shelter; subsection (f), engaging in egregious conduct upon the child or the child's sibling; and subsection (h), committing voluntary manslaughter of another child or a felony assault that results in bodily injury to the child or another child.
We find the record inadequate to support termination on any one of the four grounds. As it relates to the first two grounds, contrary to the trial court's findings, the Department failed to establish that long-term therapy did not or would not have helped the mother's anger management problems and that she failed to substantially comply with the case plan. The record shows that the mother was referred to four different programs for intensive therapy and she was unable to complete any of them because of various problems, not attributable to her. It was not until March 2002, shortly before the termination proceedings began, that the mother had to resort to paying for therapy herself.
There was no evidence presented that between March 2002 and September 2002, *87 when the termination proceedings began, the mother was assessed to determine whether the intensive therapy was assisting her anger management problems. The Department's evidence was based upon interviews and incidents that occurred prior to the mother beginning therapy. At trial, the Department's expert acknowledged that the mother "ha[d] not gotten long-term therapy," and the mother's case worker testified that the mother "had basically completed" the case plan, "[t]he only problem she had was the individual counseling, which she had not gotten." And, the only professional tests conducted revealed that the mother was amenable to treatment.
We also find troubling the Department's insistence that the mother admit "guilt" to abusing S.F. Indeed, no therapist testified that admitting culpability by public confession was an appropriate and necessary therapeutic goal in the mother's case. This court has on more than one occasion noted that such a requirement is impermissible under section 39.601(1), Florida Statutes, as a condition of any case plan. See A.C. v. Dep't of Children & Families, 798 So.2d 32, 35 n. 2 (Fla. 4th DCA 2001); D. Children v. Dep't of Children & Family Servs., 820 So.2d 980, 985 n. 6 (Fla. 4th DCA 2002)(Warner, J., concurring in part and dissenting in part)(expressing concerns that the social worker expected the parents to admit to their abuse). Furthermore, as in A.C., there was no evidence presented here that any counselor worked with the mother from a therapeutic standpoint to assist her in overcoming her state of psychological denial.
It was inappropriate to base termination on the testimony of a professional who recommended that the parents receive counseling and therapy and then, even though such counseling has not been provided, determines the parents still present a risk.
798 So.2d at 35-36.
The other two grounds for termination, Florida Statutes section 39.806(1)(f) (egregious conduct towards another child) and (h) (committing manslaughter or felony assault against another child), raise questions of prospective abuse. In the seminal case in Florida discussing prospective abuse, our supreme court stated that
To protect the rights of the parent and child, we conclude that before parental rights in a child can be permanently and involuntarily severed, the state must show by clear and convincing evidence that reunification with the parent poses a substantial risk of significant harm to the child.
Padgett v. Dep't of Health & Rehabilitative Servs., 577 So.2d 565, 571 (Fla.1991).
In a recent decision, we discussed the law on prospective abuse and noted that
Where DCF is petitioning to terminate parental rights on the basis of abuse or neglect of another child, we have emphasized that the state must show that "the behavior of the parent was beyond the parent's control, likely to continue, and place the child at risk."
F.L. v. Dep't of Children & Families, 849 So.2d 1114, 1120 (Fla. 4th DCA 2003)(quoting A.C., 798 So.2d at 35). The Department must prove a nexus between the act of abuse and any prospective abuse. See D.H. v. Dep't of Children & Families, 769 So.2d 424 (Fla. 4th DCA 2000). The issue in these types of cases is whether future behavior, which will adversely affect the child, can be "clearly and certainly predicted." L.B. v. Dep't of Children & Families, 835 So.2d 1189, 1195 (Fla. 1st DCA 2002); accord In re P.S., 825 So.2d 530 (Fla. 2d DCA 2002). Or, stated another way, *88 whether it is "likely to happen" or "expected." In re J.L., 824 So.2d 1023, 1025 (Fla. 2d DCA 2002) (citations omitted).
On appeal, the Department argues that, as to subsection (h), no nexus need be shown. Section 39.806(1)(h) allows parental rights to be terminated:
When the parent or parents have committed murder or voluntary manslaughter of another child, or a felony assault that results in serious bodily injury to the child or another child, or aided or abetted, attempted, conspired, or solicited to commit such a murder or voluntary manslaughter or felony assault.
We disagree with the Department's contention that no nexus between the acts described in subsection (h) and the potential for future abuse need be shown. As this court stated in F.L., in reiterating the constitutional requirements for termination of parental rights set forth in Padgett, "DCF carries the burden not only to establish a ground for termination but the continuing substantial risk of harm to the current child." 849 So.2d at 1122 (emphasis added). Failure to give the statutory scheme a narrow construction requiring the State to prove a nexus between the past conduct and the continuing substantial risk of harm to the current child could render the statute constitutionally infirm. See id. (holding section 39.806(1)(i) unconstitutional where it permits termination of parental rights solely upon the involuntary termination of rights to another child and shifts "DCF's responsibility to prove the elements necessary to terminate a parent's fundamental right to parent to the parent").
In closing arguments, the Department argued that the mother's failure to take responsibility for S.F.'s death is "the nexus that proves that [she] is a danger to any child in her care." We find this argument, and the evidence presented by the Department in support thereof, insufficient to support a finding that the mother posed a threat to her children because of S.F.'s death.
The record shows that the mother had taken steps to improve her parenting skills and anger management problems. Prior to being released from prison, she completed an eight-week parenting program, a sixteen-week parenting program and participated in a parent support group. She also attended additional parenting classes upon her release. At judicial reviews, the Department reported that the mother was highly "motivated" to complete and had indeed completed her case plan, with the exception of the long-term counseling. The neuropsychological evaluation conducted revealed that the mother had no impairments that would cause her to be a danger to her children and that she was capable of reestablishing a relationship with them. And, while the Department alleged that this test was based upon inaccurate case history, the Department failed to conduct any new psychological evaluation taking into account the correct information.
Moreover, because the Department failed to evaluate the mother once she began long-term counseling, there is no expert testimony as to whether the individual counseling she was receiving was making a difference in controlling her anger. The record shows that the mother was making gains in terms of her relationship with her children. Just prior to the termination proceedings, the therapist found and the court ordered that the mother could visit with J.F.-1, which by the Department's account went well. At a minimum, we find that this evidence did not support a finding that the mother's behavior was beyond her control, likely to continue, and would place the children at risk if parental rights were not terminated.
*89 In short, the Department failed to prove that the manifest best interests of the two children, J.F.-1 and J.F.-2, would be served by terminating the mother's parental rights at this time. We acknowledge the trial court's legitimate concern with whether J.F. has adequately addressed her personal "anger management" issues. Yet, in this case, there has been no competent professional or expert testimony that J.F.'s anger problems are not amenable to treatment or are likely to continue, posing a substantial risk of harm to the children. Accordingly, we reverse the termination of parental rights and return this cause to the jurisdiction of the trial court for continuation of the children's dependency status.
REVERSED and REMANDED.
MAY, J., and CHAVIES, MICHAEL B., Associate Judge, concur.
NOTES
[1] Since the mother, the father and the two children all have the same initials, the mother will be referred to as J.F., the father as J.F., Sr., the son as J.F.-1, and the daughter as J.F.-2.