STONE, J.

ON MOTION FOR REHEARING

We deny a motion for rehearing, but withdraw our decision of May 5, 2004, and substitute the following opinion.
We affirm an order terminating the parental rights of D.H., the mother. D.H. argues that the minor nature of her failure to fully cooperate is insufficient to support termination based on a lack of compliance with a case plan. She relies upon cases where this court reversed orders terminating parental rights where, despite evidence of improvement, the terminations were based solely on the parents’ past conduct. See F.L. v. Dep’t of Children & Families, 849 So.2d 1114 (Fla. 4th DCA 2003)(re-versing termination of parental rights as to seventh child where parental rights to previous six children had been terminated). See also J.F. v. Dep’t of Children & Families, 866 So.2d 81 (Fla. 4th DCA 2004)(holding that evidence did not support termination of parental rights to two children, despite mother’s prior conviction for killing her step-child). We have considered these and similar cases and find them distinguishable.
D.H.’s first child, A.Y., born in July 1999, was sheltered and adjudicated dependent in July 2000. At that time, D.H., an adjudicated dependent minor herself, was on runaway status and failed to appear at hearings concerning A.Y. A second child, MY, born in May 2000, was sheltered a month later, when D.H. was Baker Acted for a mental disorder. Thereafter, M.Y. was also adjudicated dependent.
A case plan was adopted in November 2000 and, shortly thereafter, the trial court entered an order finding that D.H. was not in substantial compliance with the case plan. D.H. was allowed only supervised visitation with the children. Thereafter, the Department of Children & Families (DCF) filed a petition to terminate D.H.’s parental rights. Since D.H. made attempts to comply with the case plan, however, the trial court continued the adjudicatory hearing.
In July 2001, over DCF’s objection, D.H. was granted unsupervised visits to allow her to participate in parenting classes with *323 the children. Thereafter, DCF sought relief from the court order allowing D.H. unsupervised visitation, stating, among other things, that the mother had not shown any capacity to appropriately parent the children while the children were in her sole care. The DCF counselor also questioned D.H.’s attention span and DCF asserted concerns about D.H.’s psychological evaluation because the evaluator reported having serious concerns about D.H.’s ability to provide a stable, calm and safe environment for the children.
Due to DCF’s continuing concerns about D.H.’s inability to parent her children while they were in her sole care, and the findings of a psychological evaluation in September 2001, D.H. was ordered to undergo a psychiatric evaluation and to participate in an assortment of services. Meanwhile, D.H. was allowed unsupervised visits with the children for four hours each Sunday.
In a November 2001 status report, DCF cited ongoing concerns about D.H.’s inability to comply with the case plan based on her failure to look for work and to provide for a family without financial assistance from friends. Moreover, D.H. regularly returned the children to the foster home hungry and with wet diapers, despite knowing that she was responsible for caring for the children and feeding them dinner during the unsupervised visitation. Moreover, contrary to court orders and DCF’s instructions, D.H. admitted that she continued to drive without a valid license.
Notwithstanding the foregoing, the trial court, in December 2001, found D.H. was working on the tasks in the case plan and she was working toward additional unsupervised visits with her children. Due to DCF’s continuing concerns about D.H.’s ability to care for the children in an unsupervised capacity, the court ordered D.H. to receive additional parenting instruction, to continue therapy, to find employment, and to remain in compliance with Florida law when transporting the children.
On January 2, 2002, the case plan was amended and continued concurrent goals of either reunification or termination of parental rights. The new case plan required D.H. to complete parenting, psychological and substance abuse evaluations, and comply with all follow-up treatment recommendations. Moreover, to gain the ability to care for her children on her own, D.H. was required to participate in in-home services from Family Builders and obtain stable housing and employment.
Six months later, due to the trial court’s ongoing concerns about D.H.’s ability to care for the children without supervision, the court ordered that custody of the children remain with DCF. Further, D.H. was, among other things, ordered to ensure the children were always transported using car seats. Meanwhile, the trial court asked for further input from the guardian ad litem.
The record reflects D.H. made some progress with her case plan. However, when reunification with the children was attempted and D.H. had unsupervised visitation with the children, she failed to both comply with the court’s directives and to cooperate with in-home services offered by DCF to safely effectuate a goal of reunification. D.H.’s failure to comply with court orders and cooperate with the in-home services remained a constant concern. Despite some progress when the children were not in D.H.’s custody, she could not adequately care for the children when they were in her custody.
By September 2002, the attempt at reunification progressed to the point that the children were conditionally placed in D.H.’s home. Soon thereafter, however, *324 the primary service provider, Family Builders, terminated its required services to D.H. because she would not cooperate by allowing them into her home. During one attempted visit by Family Builders and after several unsuccessful attempts to provide scheduled services, D.H. was so uncooperative that she refused to lower the volume of music that she was playing during the scheduled visit so that the in-home service could be conducted. The Family Builders counselors further maintained that progress was dependent upon consistent services and D.H.’s repeated refusals and cancellation of scheduled visits rendered their efforts futile. The counselors testified that D.H. made no progress over the four intermittent visits that were conducted.
Also in September 2002, the DCF counselor, during an unscheduled visit to D.H.’s home, observed a pick-up truck at D.H.’s home. The children’s ear seats were in the back bed of the truck. D.H. admitted a friend loaned her the truck and claimed that she had obtained a valid driver’s license. Upon verification, it was established that despite court orders for D.H. to comply with Florida laws when transporting the children, D.H. still did not have a valid driver’s license.
The trial court, in October 2002, found that the children were at risk in the mother’s custody, ordered supervised visitation, and changed the case plan goal to termination of parental rights.
Unlike the authorities upon which D.H. now relies, there is no showing that D.H.’s parental rights were terminated due to her prior conduct. Instead, it was her conduct during the crucial period of attempted reunification, when the children were actually in her care, that any prior compliance with court orders and cooperation with assistance offered by DCF ceased. D.H.’s noncompliance occurred despite extensive efforts by DCF to assist in every way with the reunification. Furthermore, the decision D.H. relies on, F.L., was recently reversed by the Florida Supreme Court in DCF v. F.L., 880 So.2d 602 (Fla.2004), holding constitutional the statute providing for termination of parental rights based upon a showing of both prior conduct (involuntary termination of rights to a sibling) and a substantial risk of significant harm to the current child. Id. at 609.
In November 2002, DCF filed an amended petition for termination of parental rights, alleging that D.H. continued to demonstrate poor parenting skills and failed to substantially comply with court ordered tasks despite all efforts by DCF to provide services and assistance.
At trial, D.H. tried to explain away her failure to comply with her case plan during the attempted reunification period to no avail. Additionally, some of her testimony was impeached. D.H. admitted that during the attempted reunification with her children, she refused the required in-house services.
At trial, the foster mother testified that the children were virtually potty-trained when they went to live with D.H. When the children were returned to the foster mother after the reunification failed, however, both children had regressed to wearing diapers. A DCF counselor also testified that during a visit to observe D.H. with the children, D.H. actually lost track of the youngest child, who had wandered out into the street.
Even after the failed reunification, but before the trial, D.H. made no effort to visit with her children during their 60-day referral to a supervised visitation center. Notably, the visitation center offered its services, as a special exception to its policy, notwithstanding that D.H. had exhausted her previous referral.
*325 Unlike the facts here, in F.L., the testimony indicated that F.L. was accepting services, was cooperative, attended programs on her own volition, was a good mother, and was providing appropriate care for her latest child. 849 So.2d at 1117. In F.L., the child was only removed because the office’s policy dictated that a child be removed where the parent had a prior involuntary termination. Id. Further, in F.L., unlike here, DCF relied solely on F.L.’s history and not on any new allegations of neglect. Id. In fact, in F.L., the guardian had first recommended that DCF offer F.L. a case plan for reunification; the guardian changed her mind only after meeting with the program’s attorney and recognizing F.L. had made similar promises to change with respect to another child, but had failed to follow through. Id.
Similarly unavailing is D.H.’s reliance on J.F., where this court reversed the final order terminating J.F.’s parental rights, explaining, “[a]t a minimum, we find that this evidence did not support a finding that the mother’s behavior was beyond her control, likely to continue, and would place the children at risk if parental rights were not terminated.” 866 So.2d at 88. There, the record showed that the mother had substantially completed her case plan, but was unable to complete some programs because of various problems not attributable to her. Id. at 86. In J.F., shortly before the termination proceedings began, the mother paid for and obtained therapy herself. Id. Also, there, the record reflects that DCF’s evidence offered in support of termination of J.F.’s parental rights was based upon interviews and incidents that occurred prior to the mother beginning therapy, and an evaluation revealed that she had no psychological impairments that would pose a threat to her children. Id. at 86-87.
None of the above facts are present here. Instead, the only time D.H. showed any progress in completing her case plan was when D.H. had limited and supervised contact with the children. Meanwhile, the trial court and DCF repeatedly expressed concerns about D.H.’s parenting abilities and, thus, ordered extensive services for D.H. in order to address concerns for the safety of the children during the attempted reunification. Unlike F.L. and J.F., D.H. made no individual effort on her own to obtain and comply with services. In fact, she refused, or failed, to cooperate with the services arranged by DCF as well as violated court orders.
Therefore, the motion for rehearing is denied and the final order of termination of parental rights is affirmed.
STEVENSON and HAZOURI, JJ., concur.