MORRIS, Judge.
The Department of Children and Family. Services (DCF), the attorney ad litem appointed for the children, E.R. and A.R., and the guardian ad litem appeal the order denying DCF’s petition to terminate the parental rights of S.H. (the mother) and F.R. (the father). For the reasons set forth herein, we reverse and remand.
I. Background
A. Facts leading up to the termination (TPR) petition
In June 2007, thirteen-month-old M.B. died under suspicious circumstances. The evidence suggested he had been beaten to death while in the care of the mother and father. The mother claimed she left M.B. in the father’s care while she went to another ,room. After hearing the father yell, she returned and discovered that M.B. was having trouble breathing. The father claimed M.B. had fallen off the bed. M.B. was taken to a hospital, where he died shortly after arrival.
*849 The autopsy revealed only one small external bruise around M.B.’s hairline. However, the medical examiner found numerous internal injuries, including ringed areas of hemorrhage consistent with multiple blows to the head. The medical examiner also found hemorrhaging to both of M.B.’s retinas, on the optic nerve sheath connecting the eyes to the brain, and on the muscles around the eyes. The medical examiner concluded that these injuries were consistent with shaken baby syndrome, that M.B. died from cranial cerebral trauma, and that the injuries occurred no more than two hours before M.B.’s death. Hospital records also indicate that M.B. had marijuana in his system.
The children who are the subject of the TPR petition were born in July 2008 and April 2009, subsequent to M.B.’s death. Both children were promptly taken from the parents and sheltered based on the death of M.B., as well as the parents’ drug use, lack of financial stability, and lack of adequate housing. DCF filed its petition to terminate parental rights in April 2009. As to both of the parents, DCF alleged (1) that they had engaged in conduct toward the children which demonstrated that their continuing involvement in the parent/child relationship threatened the life or well-being of the children without regard to provision of services by DCF, pursuant to section 39.806(l)(c), Florida Statutes (2008); (2) that they had engaged in egregious conduct which endangered the life, health, or safety of the child or child’s siblings or had the opportunity and capability to prevent egregious conduct that threatened the life, health, or safety of the child or child’s siblings and knowingly failed to do so, pursuant to section 39.806(l)(f); and (3) that they had committed murder or manslaughter of another child, aided or abetted such murder, or conspired or solicited to murder that child, pursuant to section 39.806(l)(h). Based on the fact that the parents were still in a relationship and did not have any concerns about the children being left unsupervised with each other, DCF argued that the children were at risk of imminent harm.
B. Circumstances surrounding the TPR trial
In relation to M.B.’s death, the mother has maintained her innocence as well as the innocence of the father.. Neither parent has cooperated with the investigation, and at the time of the TPR trial, neither parent had been charged in connection with M.B.’s death. Both parents invoked their Fifth Amendment right not to incriminate themselves during the criminal investigation and refused to testify about-the circumstances of M.B.’s death at the TPR trial. They also have refused to talk about the incident with mental health professionals.[1]
At the TPR trial, Dr. Alexander, the statewide director for the Child Protection Team and a child-abuse expert, testified that the number of blows to M.B.’s head and the evidence of shaken baby syndrome indicated that the perpetrator of the abuse was angry and out of control. Consequently, he concluded that E.R. and A.R. were at a high risk of harm because perpetrators in shaken baby syndrome cases have a high risk of recidivism and because children subjected to shaken baby syndrome have usually been injured in some other manner. When asked about the parents’ propensity to commit future harm to E.R. and A.R., he replied that “the biggest *850 predictor of serious injury or death of a child is prior injury to a child.”
A psychologist, Dr. Johnson, testified that because the mother refused to discuss the circumstances of M.B.’s death and because she “faked good” on a child abuse inventory test, he could not complete his psychological evaluation and that, therefore, the evaluation was essentially invalid. Dr. Johnson commented on the mother’s claimed ignorance about what happened to M.B. by stating that it “suggests a level of either neglect or complicity that’s very disturbing.” Dr. Johnson opined that the mother suffered from an adjustment disorder with a depressed mood. Dr. Johnson testified that the father had a “moderate pathology” which evidenced an adjustment disorder with mixed disturbance of emotion and a personality disorder. Dr. Johnson explained that both parents could suffer from additional underlying mental health issues but that without being able to discuss M.B.’s death with them, he could not complete his evaluation. He also opined that the risk to E.R. and A.R. was equal to, if not greater than, the risk to M.B. because the parents were living in circumstances identical to those that existed at the time of M.B.’s death.
Both the mother and father testified at the TPR trial that they were still in a relationship and were not concerned about leaving the children in each other’s care. They both admitted to daily drug use. The father admitted he had a serious criminal history and that at the time of the TPR trial, he was incarcerated on other unrelated charges.
C. The trial court’s order
In the order denying DCF’s petition, the trial court made separate findings as to each parent. Regarding the mother, the trial court found that the mother knew the father committed acts of abuse which led to M.B.’s death and that she was choosing to remain silent to protect herself and the father from criminal charges, yet the trial court determined that DCF failed to prove grounds for termination by clear and convincing evidence.
The trial court rejected a request by DCF, the attorney ad litem, and the guardian ad litem to find the parents jointly responsible for M.B.’s death. While the trial court acknowledged that DCF could proceed in an “up-front TPR” without offering the parents a case plan, the trial court went on to find that DCF was required to provide services to the parents until termination was granted but that, in this case, no services had been provided. The trial court noted that the mother had taken “significant steps to prove her fitness to mother” E.R. and A.R., such as completing an intensive parenting program. Ultimately, the trial court held that the mother’s invocation of her Fifth Amendment right did not provide a basis for termination and that DCF failed to prove (1) that her continuing involvement threatened the life or well-being of the children, (2) that she engaged in egregious conduct, or (3) that she was involved in the murder of another child.
Turning to the father, the trial court found that DCF proved that he engaged in egregious conduct and committed the murder of M.B. However, despite those findings, the trial court found that DCF failed to prove that the father’s continuing involvement threatened the life or well-being of E.R. and A.R.
As to both parents, the trial court found there was no evidence that either parent had a hot temper or was a mean-spirited person and that “[a]ll evidence was unanimous that the parents were good parents to M.B.” This finding appears to be based on the trial court’s observation of the parents during the trial and on the fact that *851 the mother sought treatment for M.B.’s injuries.[2]
While noting that DCF did not request a single-parent termination in its petition and did not argue for that result at trial, the trial court stated that section 39.811(6) allowed for a single-parent termination where, as in this case, the trial court determined the parent committed an egregious act or murdered a child. However, the trial court held that, as to both parents, DCF failed to prove that termination was the least restrictive means of protecting the children because DCF failed to provide any services to the parents and because “there must be a nexus between the death of little [M.B.] and the parent’s [sic] demonstrated inability to parent in the future.” The trial court declined to reach the manifest best interests analysis required by section 39.810(1)-(11) based on its conclusion that DCF failed to prove grounds for termination as to the mother and failed to satisfy the least restrictive means test as to either parent.
II. Analysis
In order to grant a petition for termination of parental rights, a trial court must find that DCF provided clear and convincing evidence that at least one of the statutory grounds for termination exists and that termination is in the manifest best interests of the children. See § 39.802(4)(a), (c); T.L. v. Dep’t of Children & Family Servs., 990 So.2d 1267, 1270 (Fla. 2d DCA 2008); Doe v. Deft of Health & Rehabilitative Servs., 563 So.2d 655 (Fla. 1st DCA 1990). Further, because parental rights constitute a fundamental liberty interest, DCF must establish that termination of parental rights is the least restrictive means of protecting the children from serious harm. See Padgett v. Dep't of Health & Rehabilitative Servs., 577 So.2d 565, 571 (Fla.1991); T.L., 990 So.2d at 1271. “On appeal, the circuit court’s ruling should be upheld if, upon the evidence presented to the circuit court, there is any principle or theory of law that would support the circuit court’s judgment terminating parental rights.” T.L., 990 So.2d at 1271 (citing G.W.B. v. J.S.W., 658 So.2d 961, 967 (Fla.1995)). “ ‘An appellate court may reverse the trial court’s order denying a petition to terminate parental rights when the denial is not supported by competent!,] substantial evidence and is not in the best interests of the children.’ ” H.D. v. J.L.D., 16 So.3d 334, 335 (Fla. 4th DCA 2009) (quoting R.A. v. P.A., 935 So.2d 120, 120 (Fla. 4th DCA 2006)).
A. The trial court did not err in finding that DCF proved statutory grounds for termination of the father’s parental rights, but it did err in failing to find that termination was the least restrictive means of protecting the children and in failing to conduct a manifest best interests analysis.
1. Statutory grounds
Section 39.806(1)(f) provides that parental rights can be terminated when a *852 parent engages in egregious conduct or has the opportunity and capability to prevent and knowingly fails to prevent egregious conduct that threatens the life, safety, or physical, mental, or emotional health of the child or the child’s sibling. T.L., 990 So.2d at 1271.
“Egregious conduct” is defined as “abuse, abandonment, neglect, or any other conduct that is deplorable, flagrant, or outrageous by a normal standard of conduct” and “may include an act or omission that occurred only once but was of such intensity, magnitude, or severity as to endanger the life of the child.” § 39.806(l)ffi(2).
T.L., 990 So.2d at 1271. Section 39.806(l)(h) provides for termination of parental rights where a parent has committed murder or manslaughter, aided and abetted the murder, or conspired or solicited the murder of another child.
Here, the trial court found that “the [fjather committed the acts of abuse which lead [sic] to the child’s death.” As a result, the trial court determined that DCF adequately proved both egregious conduct and the father’s involvement in M.B.’s murder, pursuant to sections 39.806(l)(f) & (h). We agree that there was clear and convincing evidence to support these findings.[3]
2. The nexus requirement
However, our first disagreement with the trial court’s order is its determination that to prove that termination was the least restrictive means of protecting the children, DCF was required to prove a nexus between M.B.’s death and the threat of prospective harm to E.R. and A.R. The trial court did not cite to any authority for this conclusion. This court has held in other contexts that “[w]hen termination of parental rights is based on the abuse of a sibling, the court must also find a nexus between the abuse of the sibling and the prospective abuse of the child.” T.L., 990 So.2d at 1271; see also J.T. v. Dep’t of Children & Family Servs., 908 So.2d 568, 571-72 (Fla. 2d DCA 2005).
In T.L., one child, D.L.R., was taken to the emergency room with multiple bruises; he was also suffering from dehydration, and there was evidence he had been sexually abused. 990 So.2d at 1269. Both parents denied knowledge of how the injuries occurred, and there was no evidence establishing the identity of the perpetrator. Id. DCF proceeded against the parents as to another child, D.L.H., on the basis of egregious conduct. Id. Although the mother had previously been offered services, the father was never provided with such an opportunity. Id. at 1270. Further, DCF never obtained a psychological evaluation of the father, so DCF presented no evidence that he suffered from any mental health issues. Id. Although the trial court determined there was no clear and convincing evidence that the father would pose a threat of prospective harm to D.L.H., it still found that DCF proved the father committed egregious conduct, and the trial court thereafter terminated his parental rights. Id.
On appeal, this court agreed that DCF adequately proved the father committed egregious conduct pursuant to section 39.806(l)(f). However, we went on to hold that the termination was improper because DCF failed to prove there was a threat of prospective harm. Id. at 1272. In doing so, we noted that generally a nexus can be established by proof that a parent’s mental *853 or emotional condition or drug addiction will continue and will make it highly probable that in the future the parent will abuse or neglect the other children. Id. This court determined no nexus had been established due to these facts: (1) DCF failed to obtain a psychological evaluation of the father; (2) the psychologist testified that the injuries to D.L.R. did not indicate the perpetrator lacked self-control; and (3) there was no evidence that the father had a drug addiction or a mental or emotional condition. Id.
T.L. does not drive our decision here because the facts are significantly different. The petition in T.L. was founded solely on egregious conduct pursuant to section 39.806(l)(f), whereas in this case DCF proceeded on three statutory grounds including murder of a child under section 39.806(l)(h). We believe that where DCF proves by clear and convincing evidence that a parent has murdered a child, there is no requirement for DCF to then prove a nexus between that child’s murder and a threat of prospective harm to the murdered child’s siblings.
We are cognizant of the Fourth District’s opinion in J.F. v. Department of Children & Families, 890 So.2d 434, 440-41 (Fla. 4th DCA 2004), wherein the court held that where DCF proceeds under section 39.806(1)(h), it must still prove a nexus between the murder or manslaughter of one child and the threat of prospective harm to other children. The Fourth District based its decision on the rationale espoused in Department of Children & Families v. F.L., 880 So.2d 602 (Fla.2004). In F.L., the Florida Supreme Court held that where DCF proceeds under section 39.806(l)(i), which provides for termination where DCF has already obtained termination of parental rights of another child, DCF must prove that there is a “substantial risk of significant harm to the current child.” 880 So.2d at 609. In applying the rationale of F.L. to J.F.’s case, the Fourth District held that “failure to give the statutory scheme a narrow construction requiring the State to prove a nexus between the past conduct and the continuing substantial risk of harm to the current child could render the statute constitutionally infirm.” 890 So.2d at 440-41.
We simply cannot agree with the Fourth District’s application of F.L. to a case involving a petition based on the murder of a child under section 39.806(l)(h). The facts of F.L. did not involve the murder of a child. We believe this distinction is of the utmost importance. The risk in this kind of case is clear, and any chance of subjecting the living children to circumstances that could result in a similar fate is unacceptable. Furthermore, there is no nexus requirement within the statute. While we recognize that parental rights are fundamental, we also emphasize that “ ‘the [parental] right is not absolute but is subject to the overriding principle that it is the ultimate welfare or best interest of the child which must prevail.’ ” Padgett, 577 So.2d at 570 (quoting In re Camm, 294 So.2d 318, 320 (Fla.1974)). We therefore certify conflict with J.F., and we certify the following question as one of great public importance:
WHERE THE STATE PROVES BY CLEAR AND CONVINCING EVIDENCE THAT A PARENT HAS COMMITTED ANY OF THE ACTS SET FORTH IN SECTION 39.806(1)(H), FLORIDA STATUTES (2008), MUST THE STATE ALSO PROVE THAT THE PARENT POSES A SUBSTANTIAL RISK OF SIGNIFICANT HARM TO THE OTHER CHILDREN WHO ARE THE SUBJECT OF A PETITION FOR TERMINATION OF PARENTAL RIGHTS?
*854 But irrespective of whether a nexus is required in this type of case, we believe that DCF adequately proved that E.R. and A.R. were at substantial risk of significant harm from the father. As noted by the Florida Supreme Court in F.L., a parent’s egregious abuse or neglect of another child “will tend to indicate a greater risk of harm to the current child.” 880 So.2d at 610. Here, the trial court determined that the father committed egregious abuse including the acts which ultimately led to M.B.’s death. There was evidence presented that the perpetrator of M.B.’s abuse lacked self-control and that there is a high likelihood of recidivism by the perpetrator. In fact, Dr. Alexander opined that the greatest risk factor for injury or death to a child is the prior injury of a child. And although Dr. Johnson was not able to complete his evaluation of the father due to the father’s lack of cooperation, Dr. Johnson opined that the father was preliminarily diagnosed with an adjustment disorder with mixed disturbance of emotion and with a personality disorder. All of this evidence, when combined with the father’s admitted drug use and his admitted serious criminal history, leads us to conclude that DCF proved there is a substantial risk of prospective harm to E.R. and A.R. from the father. Compare T.O. v. Dep’t of Children & Families, 21 So.3d 173, 179-80 (Fla. 4th DCA 2009) (holding that there was “ample evidence that the father will continue to be a risk to all of the children in the future[ ] and that it [was] highly unlikely that he [would] ever improve” where father was diagnosed with antisocial personality disorder and was deemed a continued risk to the children and where he had not benefitted from services which had been provided), with T.L., 990 So.2d at 1272-73 (holding no nexus was established where there was no evidence that father lacked self-control, was addicted to drugs, or had a mental or emotional condition), and J.F., 890 So.2d at 441-42 (holding DCF failed to prove nexus despite fact that mother failed to take responsibility for child’s death, where mother took steps to improve her parenting skills and anger management problems and had almost entirely completed her case plan and her neurop-sychological evaluation revealed she had no impairments which would cause her to be a danger to her children).
3. Provision of services
Our second disagreement with the trial court’s least restrictive means analysis is its determination that DCF was required to provide services to the father or prove that provision of services would be futile. In making this determination, the trial court stated that the Florida Supreme Court typically defines least restrictive means to include DCF’s good faith effort to rehabilitate the parents and reunify the family with a goal of reestablishing the parent-child bond. The trial court concluded that because DCF had not made such an effort, it had not proven that termination was the least restrictive means of protecting E.R. and A.R.
It is true that in ordinary cases, to prove that termination of parental rights is the least restrictive means of protecting the children, DCF must show that it has made a good faith effort to rehabilitate the parent and reunite the family, such as through the provision of a case plan. See In the Interest of T.M., 641 So.2d 410, 413 (Fla.1994). However, in cases involving egregious conduct by the parent, “the termination of parental rights without the use of plans or agreements is the least restrictive means.” Id.; see also K.A. v. Dep’t of Children & Family Servs., 880 So.2d 705, 709 (Fla. 2d DCA 2004); Dep’t of Children & Families v. B.B., 824 So.2d 1000, 1009 (Fla. 5th DCA 2002). If the provision of *855 services is not required where egregious conduct has been found, then obviously the same rationale applies in eases involving the murder of a child. Indeed, section 39.806(2) provides that “[reasonable efforts to preserve and reunify families are not required if a court of competent jurisdiction has determined that any of the events described in [section 39.806](l)(e)-(l) have occurred.”
Of course, in this case, the egregious conduct and murder was perpetrated against M.B., rather than on E.R. and A.R. And we acknowledge our prior case law holds that in cases involving a threat of prospective abuse based on egregious abuse of another child, DCF must prove the parent would not benefit from court-ordered services in order to satisfy the least restrictive means test. See T.L., 990 So.2d at 1273 (holding that where DCF failed to present evidence that the father abused one child or that the father suffered from a mental or emotional condition which would prevent him from benefitting from court-ordered services, DCF failed to establish that termination was the least restrictive means of protecting the child); K.A., 880 So.2d at 709 (holding that while DCF proved termination was the least restrictive means of protecting abused child, it did not prove it was the least restrictive means of protecting two older children where there was no evidence of abuse of the older children, no nexus between past abuse of the third child and a risk of potential harm to the older children, and no evidence that the parents suffered physical or mental ailments which would inhibit their ability to parent the older children safely).
Yet we again emphasize that this case involves the murder of a child. Just as we hold no nexus is required where a court determines that DCF proved a parent committed the murder or manslaughter of a child or was involved in such activity pursuant to section 39.806(l)(h), we likewise hold that in such cases, DCF is not required to prove that services would be futile in regard to the other children. Although sections 39.802(5) and 39.806(3) provide that in expedited termination cases, DCF “may ... file ... a case plan having a goal of termination of parental rights to allow continuation of services until the termination is granted or until further orders of the court are issued,” there is no statutory mandate that DCF do so where it has proven grounds for termination pursuant to section 39.806(l)(h). The futility of offering services to the parent who has already murdered one child is obvious to this court.
Although we reject the argument that DCF is required to prove that the provision of services would be futile in prospective abuse cases proceeding under section 39.806(l)(h), we hold that under the facts of this case, the futility of providing services to the father was adequately proven by DCF. There was evidence presented that he was at least preliminarily diagnosed with a mental disorder, he was a self-admitted drug user, he was incarcerated at the time of the TPR trial on other serious criminal charges, and he refused to cooperate during his psychological evaluation. Furthermore, the trial court determined he was responsible for M.B.’s death, which is significant given that Dr. Alexander opined that whoever caused M.B.’s injuries lacked self-control and had a likelihood of recidivism. Clearly, termination of the father’s parental rights was the least restrictive means of protecting E.R. and A.R.[4] Cf. T.L., 990 So.2d at 1273.
*856 4. Manifest best interests of the children
Although the trial court stated it was not reaching the manifest best interest factors set forth in section 39.810, the trial court did, in fact, go on to address a few of the statutory considerations. However, the court did not address all of the statutory factors as it was required to do. See § 39.810 (providing that in a hearing on a TPR petition, “the court shall consider the manifest best interests of the child”) (emphasis added); A.B. v. Dep’t of Children & Family Servs., 40 So.3d 928 (Fla. 2d DCA 2010) (reversing and remanding for further proceedings where trial court’s order failed to address manifest best interest factors on the basis that statute requires courts to consider and evaluate each factor and to enter á written order evidencing the findings). There is more than enough evidence in the record indicating that termination of the father’s parental rights would be in the manifest best interests of the children. However, this court’s case law in A.B. mandates that a trial court must make that determination during a TPR trial, and therefore, we cannot rule on this issue in the first instance but must remand it for the trial court to fully consider all of the factors set forth in section 39.810 and to enter an order evidencing its findings.
B. The trial court had the authority to order a single-parent termination.
Although we believe the trial court erred in its findings as to both parents, we must address the issue of single-parent termination because it appears that the trial court may have been confused about its ability to reach that result. Though the trial court’s decision not to terminate the father’s parental rights seems to rest on DCF’s purported failure to satisfy the least restrictive means test, we note that the trial court twice stated in its order that DCF did not plead for a single-parent termination nor argue for that result during trial. These statements could be read to mean that even if the trial court had determined that DCF adequately satisfied the least restrictive means test, the trial court would be constrained from ordering a single-parent termination based on DCF’s failure to request that result. Consequently, even though we conclude that DCF proved statutory grounds and satisfied the least restrictive means test as to both parents (as we discuss with regard to the mother below), we are compelled to clarify that the trial court can order a single-parent termination as to the father if it determines, that is in the manifest best interests of the children.
Section 39.811(6)(d) provides that a trial court may terminate the parental rights of one parent without terminating the rights of the other parent “[i]f the protection of the child demands [it].” Single-parent termination is also authorized if a trial court determines that DCF proved the statutory grounds set forth in sections 39.806(l)(d), (f)-(l). § 39.811(6)(e). Because section 39.811 addresses the authority of the court[5] and not the duties of a petitioner, trial courts have the discretion to enter single-parent terminations where *857 the facts justify that result, even in the absence of a specific request by DCF. This case falls squarely within sections 39.811(6)(d) and (e). Thus, on remand, if the trial court determines that termination of the mother’s parental rights is not in the best interests of the children but that termination of the father’s rights is in the best interests of the children, the trial court should enter an order of single-parent termination as to the father.
C. The trial court erred in finding that DCF failed to prove statutory grounds or to satisfy the least restrictive means test as to the mother and in failing to conduct a manifest best interests analysis.
1. Statutory grounds
Regarding the mother, the trial court made the factual finding that “the [m]other surely knows” that the father committed the acts resulting in M.B.’s death, yet the mother “chooses to remain silent to protect the [fjather from murder charges and to protect herself from criminal charges as well.” Despite this finding, the trial court determined that DCF failed to prove the mother’s continuing involvement threatened the life of the children and failed to prove she committed egregious conduct or aided or abetted in M.B.’s murder.
Given the evidence in this case, we hesitantly agree with the trial court’s legal determinations that DCF failed to prove the mother committed or aided and abetted in M.B.’s murder or that her continuing involvement threatened the life or well-being of the children.[6] However, we disagree with the trial court’s legal determination that DCF failed to prove the mother engaged in egregious conduct.
As we previously explained, egregious conduct includes neglect and “any other conduct that is deplorable, flagrant, or outrageous by a normal standard of conduct.” § 39.806(l)(f)(2). Egregious conduct may be either an affirmative act or an omission, and it may occur only once yet be of such intensity, magnitude, or severity as to endanger the life of the child or the child’s siblings. See § 39.806(l)(f)(2).
The trial court found and the evidence supports the finding that M.B. was solely in the custody of the parents at all relevant times and in the hours preceding M.B.’s death or, in other words, when the fatal blows were inflicted on him. The evidence presented at the TPR . trial was that the parents were still romantically involved and that neither parent had any concerns about leaving E.R. and A.R. with the other parent. And while the parents have the right to invoke the Fifth Amendment for purposes of protecting themselves from criminal prosecution, . in doing so, they have refused to fully cooperate during their psychological evaluations,[7] and they refused to testify about M.B.’s death during the TPR trial. As such, an adverse inference may be drawn. See Mitchell v. United States, 526 U.S. 314, 328, 119 S.Ct. 1307, 143 L.Ed.2d 424 (1999) (holding that adverse inferences may be drawn in civil cases where a party refuses to testify in response to probative evidence offered against them).
*858 “[W]here there is evidence that a child suffered abuse by one or both of the parents present, there is clear and convincing evidence of egregious abuse to support termination of parental rights of both parents.” M.W. v. State, Dep’t of Children & Families, 737 So.2d 1227, 1228 (Fla. 2d DCA 1999). In fact, “ ‘a parent who was not present during[ ] or who did not participate in[] physical abuse may still have their parental rights terminated if they knowingly failed to protect the child from egregious abuse.’ ” T.L., 990 So.2d at 1271 (quoting K.A., 880 So.2d at 708). We conclude that the trial court misapplied the law in finding that the mother did not commit an egregious act. Even if the mother did not witness the abuse, she was present in the house and surely knew what was occurring, especially in light of the numerous injuries to M.B. which occurred within two hours of his death. Nevertheless, she chose to conceal her knowledge of the incident and to continue her relationship with the father. The evidence also suggests that she will knowingly fail to take steps to protect E.R. and A.R. from prospective abuse in the future because she has expressed she has no concerns about leaving them in the father’s care. In our view, these facts were sufficient to prove that the mother engaged in conduct which is deplorable, flagrant, or outrageous when compared to a normal standard of conduct and therefore, DCF sufficiently proved grounds for termination pursuant to section 39.806(l)(f).
2. The nexus requirement
Because this case is a “prospective abuse case” and because the trial court found that DCF did not prove grounds for termination as to the mother pursuant to section 39.806(l)(h), we must consider whether DCF established a nexus between M.B.’s death and a risk of substantial harm to the other two children. T.L., 990 So.2d at 1272. Although based on the record evidence in this case, the mother appears to present a less direct risk to E.R. and A.R. than the father, her continuation of the relationship with the father as well as her testimony that she had no concerns about leaving the children in the father’s care weighs against her in an analysis of whether she can provide a safe environment for the children. She is an admitted drug user, and there was evidence suggesting she may suffer from a mental condition. The fact that M.B. had marijuana in his system at the time of his death suggests he was exposed to the parents’ drug use. Additionally, Dr. Johnson opined that the mother’s claimed ignorance about what happened to M.B. suggested an ominous level of neglect or complicity. Moreover, we question the veracity of the mother’s trial testimony that she would leave the father if she could obtain custody of the children on her own. In contradiction to her own testimony, the trial court observed that she was blowing kisses and mouthing the words “I love you” to the father during the TPR trial. Those facts, when combined with the fact that the mother waited until the eleventh hour— that is, the TPR trial — to express a willingness to separate from the father, cast doubt on the mother’s statement. Accordingly, we hold that DCF sufficiently established by the evidence that the mother posed a threat of significant prospective harm to E.R. and A.R. See T.O., 21 So.3d at 179 (holding that although mother presented less direct risk of harm to children who had not been abused, her parental rights were properly terminated where she refused to separate herself from the father who was the perpetrator of the abuse, thereby demonstrating that she could not provide a safe environment for the children); cf. T.L., 990 So.2d at 1272 (holding nexus was not established where there was *859 no evidence father had drug addiction or suffered from a mental or emotional condition).
8. Provision of services
Turning to the issue of provision of services, we reiterate that this is not a case based solely on abuse or neglect. This is a case involving the murder of a child and the threat of prospective harm to the murdered child’s siblings. We recognize that the trial court determined from the evidence that DCF failed to sufficiently prove that the mother engaged in the conduct described in section 39.806(1)(h), and we affirm that determination. However, we must strongly emphasize that we believe that the mother’s egregious conduct in knowingly failing to protect M.B. from the abuse which led to his death and in refusing to answer questions about the incident makes it a very close question as to whether the mother aided and abetted in M.B.’s murder for purposes of termination of parental rights.[8] And while we acknowledge this court’s opinions in prospective abuse cases requiring DCF to either make a good faith effort to rehabilitate the parent and reunite them with the children or prove that the provision of court-ordered services would be futile, we believe such cases are distinguishable. Those cases did not involve the murder of a child and unresolved factual questions as to how the murder occurred. Cf. T.L., 990 So.2d at 1269-73; K.A., 880 So.2d at 707-10. Nor did they involve parents who continued their relationship all the while concealing their knowledge of how the murder occurred. Cf. T.L., 990 So.2d at 1269-73; K.A., 880 So.2d at 707-10. Finally, they did not involve parents who both testified that they would have no problem with the other children being in the care of the other parent, despite the fact that one, if not both of them, were directly responsible for a child’s murder. Cf. T.L., 990 So.2d at 1269-73; K.A., 880 So.2d at 707-10. Under the facts of this case, we cannot conclude that DCF was required to prove that it had offered services to the mother or that the provision of services would be futile.
But even if DCF was required to prove the futility of providing services to the mother, we believe that factor is self-evident here. There were no court-ordered services provided to the mother, but as we already noted, no court-ordered services were needed at the time of M.B.’s death because E.R. and A.R. had not yet been born. And because E.R. and A.R. were sheltered shortly after birth and because DCF immediately moved for termination, there were no court-ordered services to continue pursuant to sections 39.802(5) and 39.806(3). Furthermore, sections 39.802(5) and 39.806(3) use the word may rather than shall when discussing the provision of a case plan in an up-front termination. Consequently, in such cases, the provision of a case plan is permissive rather than mandatory. See Palm Beach Cnty. Canvassing Bd. v. Harris, 772 So.2d 1273, 1287 (Fla.2000) (explaining that statute which used the word shall was mandatory whereas a statute which used the word may was permissive).
DCF did offer, on a voluntary basis, some services to the mother such as drug screens, psychological evaluations, and housing assistance. The mother admitted using drugs and flunking some drug screens. Dr. Johnson’s statement that the mother did not suffer from a pathology which would prevent reunification must be *860 viewed in context: Dr. Johnson could not complete a full evaluation due to the mother’s refusal to discuss the circumstances of M.B.’s death, and he preliminarily diagnosed her with an adjustment disorder with a depressed mood.
We acknowledge that through her own initiative, the mother completed an intensive six-month parenting program. We also recognize that DCF presented no evidence regarding the mother’s interactions with the children, her parenting skills, or her bond with the children.[9] However, these factors must be weighed against the other factors suggesting that provision of services would be futile. Perhaps the biggest factor suggesting that provision of services would be futile is the fact that the mother continued her relationship with the father. Even if the mother did not witness the father’s inflicting the abuse on M.B. which led to his death, she had to know the father was the person responsible because the evidence showed that M.B. was solely in the parents’ care at the time the fatal injuries were inflicted. Yet the mother chose to allow E.R. and A.R. to have visitation with the father and even went so far as to testify that she had no concerns about leaving them in the father’s care. Her eleventh-hour offer to leave the father does not persuade this court that she could be rehabilitated and reunified with the children, especially where she was visibly showing her affection for the father at the TPR trial. The mother’s refusal to discuss the circumstances of M.B.’s death also weighs heavily in favor of a finding of futility because it prevented a complete mental health evaluation. We dp not know whether the mother is suffering from a mental health problem that would prevent her from benefitting from court-ordered services, cf. T.L., 990. So.2d at 1273, but this uncertainty is due to the mother’s refusal to submit to a complete mental health evaluation, i.e., it is of her own doing, and the children should not be punished and prevented from achieving permanency on that basis.
The facts of this case are very disturbing, and we are loathe to rule in any way which might risk the lives of other children whose parents have engaged in such horrific conduct. We again acknowledge that parental rights are fundamental in nature, but we conclude that DCF not only established a statutory basis for termination of the mother’s parental rights pursuant to section 39.806(l)(f), but it also proved that termination was the least restrictive means of protecting E.R. and A.R. under the facts of this case.
4. Manifest best interests of the children
As with the father, the trial court expressly failed to fully consider all of the manifest best interest factors set forth in section 39.810. Therefore, pursuant to A.B., we must remand this issue to the trial court with directions to fully consider those factors and to enter a written order evidencing the findings. 40 So.3d at 928.
III. Conclusion
Based on the facts of this case, we hold that the trial court erred by finding — as to the father — that DCF was required to prove a nexus between M.B.’s murder and a threat of prospective harm to E.R. and A.R., and we certify conflict with J.F. As to the mother, we hold that the trial court erred by finding that DCF failed to prove a basis for termination of the mother’s parental rights pursuant to section *861 39.806(l)(f). As to both parents, we hold that the trial court erred by finding that termination of the parents’ parental rights was not the least restrictive means of protecting the children from harm due to DCF’s failure to provide services. However, we remand for the trial court to conduct a full manifest best interests analysis. If the trial court finds that termination is in the manifest best interests of the children, it shall terminate the parental rights of the parents.
Reversed and remanded, conflict certified, and question certified.
DAVIS and NORTHCUTT, JJ., Concur.

. This is despite the fact that any information they might have divulged during their evaluations could not be used against them in criminal proceedings if they chose to invoke the psychotherapist-patient privilege. See § 90.503(2), Fla. Stat. (2008).

. We note that in conjunction with these findings, the trial court appeared to question Dr. Johnson's psychological evaluation, stating that the results of the evaluation did not raise any red flags beyond the facts that the parents lacked adequate housing and financial stability, that the father had a significant criminal history and was incarcerated, that the parents used drugs, and that another child died a brutal death while in their care. The trial court also commented that Dr. Johnson’s testing indicated risks to E.R. and A.R. but not a specific risk of child abuse.
Similarly, the trial court appeared to give little weight to Dr. Alexander’s testimony by finding that his opinion that “the biggest predictor of serious injury or death of a child is prior injury to a child” was speculative and not a legal basis for termination.

. We need not address whether DCF adequately proved grounds for termination pursuant to section 39.806(l)(c) based on our determination that DCF provided clear and convincing evidence of the other two statutory grounds.

. We also note that the facts of this case exemplify situations where sections 39.802(5) and 39.806(3) might be inapplicable. Here, at the time of M.B.’s death, the other children *856 had not yet been bom. Thus, no services were needed. After E.R. and A.R. were born and immediately sheltered, DCF filed its TPR petition. Thus, there were no services already in place for DCF to continue.

. See State Dep’t of Health & Rehabilitative Servs. v. Natural Parents of A.C., 660 So.2d 330, 332 (Fla. 2d DCA 1995) ("[T]he trial court had the authority to grant the petition for termination of parental rights as to the mother if it found the requirements of chapter 39 had been met, even if it denied the petition as to the father.”).

. We note that DCF provided some services to the mother through a voluntary case plan. However, at the time of the TPR trial, there was no court-ordered case plan in place. This formed the basis for the trial court's refusal to find this statutory ground. See § 39.806(l)(c).

. The trial court's finding that the parents cooperated with their psychological evaluations is only partially supported. While the parents submitted themselves for evaluation, they refused to answer questions about M.B.’s death, which prevented Dr. Johnson from completing the evaluations.

. We do not comment on whether the mother’s conduct would give rise to criminal liabil-hy-

. We question how DCF was expected to present evidence on the mother’s bond with the children when the children were sheltered shortly after birth and therefore no bond could be established.