830 So.2d 939 (2002)
C.A.H., The Mother, Appellant,
v.
DEPARTMENT OF CHILDREN & FAMILIES, Appellee.
No. 4D02-1193.
District Court of Appeal of Florida, Fourth District.
November 20, 2002.
Victoria A. Vilchez, West Palm Beach, for appellant.
Jeffrey Dana Gillen, West Palm Beach, for appellee.
PER CURIAM.
J.H. was born to C.A.H. in June of 2000. Florida's Department of Children and Families ("DCF") took J.H. into custody in December of 2000, and, in March of 2002, the parental rights of C.A.H. and those of J.H.'s biological father were terminated. C.A.H. alone has appealed the termination, arguing that (1) her incarceration was insufficient to support termination under section 39.806(1)(d)1., Florida Statutes (2001), and (2) her rights should not have been terminated without DCF first offering her a case plan with a goal of reunification. We affirm.
The evidence at the March 2002 termination hearing established that C.A.H. has six children: J.H., the child involved in these proceedings; three children, whom she has not seen in three years, who reside with their father's family; and two other children, whom she has not seen in two years, who live with their father. C.A.H. has been incarcerated for the vast majority *940 of J.H.'s short life. J.H. was born on June 29, 2000, just days after his mother was released from jail. Thereafter, C.A.H. took her newborn son to West Palm Beach to live with Linda Vaughn, a woman whom she met while incarcerated. Less than a month after his birth, J.H.'s mother left him and little more than the supplies that she had received from the hospital following his birth with Vaughn while she went to Tampa. While in Tampa, C.A.H. was arrested and spent eighty-seven days incarcerated. According to C.A.H., by the time she was released, she could find neither Vaughn nor her son.
On December 11, 2000, C.A.H. was arrested again. This time she was incarcerated until February 11, 2001. During C.A.H.'s incarceration, a child abuse report was filed against Vaughn. DCF took Vaughn's three children and J.H. into custody on December 16, 2000. C.A.H. discovered J.H.'s whereabouts during her December 2000 incarceration.
When C.A.H. was released in February 2001, she resided with J.H.'s father's mother in Brandon, Florida. Although C.A.H. was employed at a nursing home, she did not attempt to provide financial support for J.H. C.A.H. also failed to appear for a February 2001 hearing on DCF's dependency petition. While C.A.H. testified that she called the DCF caseworker and explained that she had been unable to secure transportation, the caseworker expressly denied this. On May 13, 2001, C.A.H. was arrested again. While the evidence at the hearing was not very clear on this issue, it appears that C.A.H. was released on bond for two weeks, rearrested on June 12, 2001, released ROR on July 10, 2001, and arrested again on September 1, 2001. Shortly after C.A.H.'s May 13, 2001 arrest, DCF filed a petition to terminate her parental rights and those of J.H.'s biological father.
Despite her repeated incarceration, failure to provide support for J.H. when able, and failure to appear at scheduled hearings, C.A.H. testified that she did not want her parental rights terminated and that she wanted custody of J.H. During her incarceration, C.A.H. had begun work on her G.E.D. and was participating in employability, life skills, and parenting programs. C.A.H. was scheduled to be released from jail on May 17, 2002approximately two months following the termination hearing.
As for J.H., during the time that his mother had been incarcerated, he had been in a shelter. Eight months prior to the termination hearing, J.H. had been placed with a foster family who was willing to adopt him. J.H.'s guardian ad litem and the DCF worker who had made the placement both testified that the child was beginning to be "less cautious" and more secure. Both opined that it would not be in J.H.'s best interests to be reunited with his biological parents. On this evidence, the trial court terminated the rights of J.H.'s biological parents, finding that they had abandoned the child.
First, the trial court's order clearly reflects that the termination was predicated upon the judge's finding that C.A.H. had abandoned her child, and not on the mother's incarceration, although the mother's lifestyle, which included repeated trips to jail, was a factor the trial judge considered.[1]See F.G. v. Dep't of Children & *941 Families, 820 So.2d 1027, 1030 (Fla. 4th DCA 2002)(holding that a parent's incarceration is a factor that may be considered in assessing whether a parent has abandoned his or her child). "Abandonment" is defined by statute as follows:
"Abandoned" means a situation in which the parent ..., while being able, makes no provision for the child's support and makes no effort to communicate with the child, which situation is sufficient to evince a willful rejection of parental obligations. If the efforts of such parent... to support and communicate with the child are, in the opinion of the court, only marginal efforts that do not evince a settled purpose to assume all parental duties, the court may declare the child to be abandoned.
§ 39.01(1), Fla. Stat. (2001). The trial judge's finding of abandonment is supported by the record.
The mother contends that the order of termination must be reversed due to DCF's failure to offer her a case plan with a goal of reunification. Florida's governing statutes clearly state that when DCF seeks to terminate parental rights due to abandonment, it need not offer the parent a case plan with a goal of reunification. See §§ 39.802(5), 39.806(3), Fla. Stat. (2001). In cases of abandonment, the goal of the case plan can be termination of parental rights. See § 39.806(3). Still, our supreme court has held that since parental rights constitute a "fundamental liberty interest," in each case the State must establish that termination is the "least restrictive means of protecting the child from serious harm." Padgett v. Dep't of Health & Rehabilitative Servs., 577 So.2d 565, 571 (Fla.1991). The Padgett court went on to state that "ordinarily" establishing that termination was the least restrictive means would require the state to make a good faith attempt at rehabilitating the parent or reunifying the family. Id.
Here, we agree with the trial court's implicit finding that the facts of the instant case support DCF's decision not to attempt rehabilitation or reunification. The record adequately supports a conclusion that termination of C.A.H.'s parental rights was the least restrictive means of protecting J.H. from further harm. We affirm the order of termination.
AFFIRMED.
STEVENSON, SHAHOOD and HAZOURI, JJ., concur.
NOTES
[1] Under section 39.806(1)(d), Florida Statutes (2001), a parent's incarceration alone may serve as a basis for termination of parental rights but only where (1) the parent is expected to be incarcerated in the future for a substantial portion of the time before the child reaches eighteen, see In re J.D.C., 819 So.2d 264, 266 (Fla. 2d DCA 2002); (2) the incarcerated parent has been determined to be a violent career criminal, a habitual violent felony offender or a sexual predator or has been convicted of certain enumerated crimes; or (3) the court determines that continuing the relationship with the incarcerated parent would be harmful to the child.