874 So.2d 1246 (2004)
C.B., the Mother, Appellant,
v.
DEPARTMENT OF CHILDREN AND FAMILIES, Appellee.
No. 4D03-4395.
District Court of Appeal of Florida, Fourth District.
June 9, 2004.
Rehearing Denied July 8, 2004.
*1248 Karen Martin of Karen Martin, P.A., West Palm Beach, for appellant.
Jeffrey Dana Gillen, West Palm Beach, for appellee.
POLEN, J.
This appeal arises from a final order terminating the parental rights of C.B., mother of T.N.B. C.B. raises several arguments on appeal. For the reasons discussed in detail below, we reverse the termination order and remand the case for further proceedings consistent with this opinion.
The child, T.N.B., was four days old when a verified petition for dependency was filed. T.N.B. has not actually met her mother. T.N.B. was born while her mother was serving a prison sentence. When the mother was incarcerated, her first child was adjudicated dependent and placed with the father. Thereafter, the mother was given a case plan as to her first child. The mother was incarcerated for the entire length of that case plan. No case plan was offered for T.N.B.
The mother was furloughed from jail for medical reasons in December of 2001. During this time, she became pregnant with T.N.B. She returned to jail and was continuously incarcerated from August 3, 2000. She was released on December 23, 2003.
After a hearing, the trial court concluded that DCF established abandonment, as defined in section 39.01(1), Florida Statutes (1999). The trial court also found that DCF established that the mother's continuing involvement with the child threatens the child's well being and would be harmful to the child, that the mother engaged in egregious conduct, and that the manifest best interests of the child are served by terminating the mother's parental rights. A final order terminating the rights of the mother was entered on October 10, 2003.
I. Abandonment
Initially the mother contends the trial court erred in terminating her parental rights because the record did not support the conclusion that she abandoned her child. We agree.
"A finding that evidence is clear and convincing to support termination of parental rights enjoys a presumption of correctness and will not be overturned on appeal unless clearly erroneous or lacking in evidentiary support." J.F. v. Dep't of Children and Families, 866 So.2d 81, 2004 WL 32673 (Fla. 4th DCA 2004). "`Clear and convincing' is an intermediate level of proof; the evidence must be credible; the memories of the witnesses must be clear and without confusion; and the sum total of the evidence must be of sufficient weight to convince the trier of fact without hesitancy." In re Davey, 645 So.2d 398, 404 (Fla.1994).
Section 39.01, Florida Statutes, defines "abandoned" as follows:
a situation in which the parent or legal custodian of a child or, in the absence of a parent or legal custodian, the caregiver responsible for the child's welfare, while being able, makes no provision for the child's support and makes no effort to communicate with the child, which situation is sufficient to evince a willful rejection of parental obligations. If the efforts of such parent or legal custodian, or caregiver primarily responsible for the child's welfare, to support and communicate with the child are, in the opinion *1249 of the court, only marginal efforts that do not evince a settled purpose to assume all parental duties, the court may declare the child to be abandoned.
A parent's incarceration can be a factor the court considers for terminating parental rights based on abandonment, but incarceration alone is insufficient. In re T.B., 819 So.2d 270 (Fla. 2d DCA 2002).
Florida Statutes Section 39.806(1)(d), states that parental rights may be terminated on the basis that a parent of the child is incarcerated in a state or federal correctional institution, and either (a) the period of time for which the parent is expected to be incarcerated will constitute a substantial portion of the period of time before the child will attain the age of eighteen years, (b) the incarcerated parent has been determined by the court to be a violent career criminal, a habitual violent felony offender, a habitual felony offender, a sexual predator, or has been convicted of first or second degree murder, or a sexual battery that constitutes a capital life, or first degree felony, or has been convicted of a substantially similar offense in another jurisdiction, or (c) the court determines by clear and convincing evidence that continuing the parental relationship with the incarcerated parent would be harmful to the child.
Id. at 273.
This court has previously affirmed the termination of a mother's parental rights when the mother spent the majority of the young child's life incarcerated and made no effort to provide for the child during the brief times she was not incarcerated. See C.A.H. v. Dep't of Children & Families, 830 So.2d 939 (Fla. 4th DCA 2002). In C.A.H., this court specifically noted that there were times the mother was able to provide for her children, but did not. That is not true of the case at bar. C.B. has been incarcerated since the birth of her daughter, T.N.B. At no time has she been able to provide for the child but elected not to.
Both parties cite to T.C.S. v. Department of Health & Rehabilitative Services, 647 So.2d 1025 (Fla. 4th DCA 1994). In T.C.S., this court reversed the termination of a father's parental rights based on his incarceration and his failure to substantially complete his case plan. The child in T.C.S. was removed from his mother's custody the day after he was born because cocaine was found in the baby's system. That baby was placed with the maternal grandmother. The dependency petition alleged both parents had substance abuse problems and the father failed to protect the minor child in that he allowed his wife to ingest cocaine during her pregnancy. A case plan, with a goal of reunification, was initially given to the father.
This court held that the trial court erred in terminating the father's rights due to his failure to substantially comply with his case plan since the father did everything that was available to him while he was incarcerated. Further, the father received no assistance from HRS and his letters to HRS went unanswered. This court also held that termination on abandonment grounds was improper. Although futile, since the father's attempts to communicate with the grandparents and HRS went unanswered, the father did attempt to communicate. As a result, this court concluded that the father had not abandoned the child. Id.
The case at bar is analogous to T.C.S. In this case, the mother, the aunt, and the social worker all testified that the mother kept in touch with the aunt, the aunt kept in touch with DCF and the mother was constantly asking about her child through the aunt. The child's aunt sent the mother pictures of the child and kept the mother *1250 informed of the child. In fact, the aunt testified that the mother asked about her children "all the time."
Although, unlike T.C.S., there is no indication the mother attempted to contact DCF, DCF admitted it had never met the mother. DCF attempts to distinguish this case from T.C.S. on that basis. It contends that the mother never contacted the child's custodian, only her sister. This distinction is unpersuasive. The T.C.S. opinion does not emphasize whom the father was trying to contact regarding his son, only that he had made efforts to contact his son.
Section 39.01, Florida Statutes, defines abandonment. The statute includes a situation where a parent "makes no provision for the child's support and makes no effort to communicate with the child." The language of the statute does not specify that the parent must attempt to communicate with any particular person. Further, the record makes clear that the mother's communication with her sister was ongoing.
[I]t is plain beyond the need for multiple citation that a natural parent's desire for and right to the companionship, care, custody, and management of his or her children is an interest far more precious than any property right.... A parent's interest in the accuracy and justice of the decision to terminate his or her parental status is, therefore, a commanding one.
Perlow v. Berg-Perlow, 2004 WL 583130, ___ So.2d ___ (Fla. Mar.25, 2004) (internal quotations omitted) (quoting Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599, (1982)).
Although we recognize the deference given to the trial court in this situation, as well as the concerns surrounding this child, there is no evidentiary support in the record for the conclusion that the mother abandoned the child under the language of the statute. Her incarceration alone is insufficient to justify the termination. As a result, we reverse the termination order inasmuch as it is based on a finding of abandonment.
II. Least restrictive means of protecting the child
C.B. next contends the trial court erred in finding that any continued involvement between her and her child would threaten the life, safety, well-being, or physical, mental, or emotional health of the child irrespective of services. DCF must prove the allegations supporting the termination of parental rights by clear and convincing evidence and must establish that termination of those rights is the least restrictive means of protecting the child from harm. Padgett v. Dep't of Health & Rehabilitative Servs., 577 So.2d 565, 571 (Fla.1991). Section 39.806(1)(c), Florida Statutes, allows for parental rights to be terminated when:
the parent or parents engaged in conduct toward the child or toward other children that demonstrates that the continuing involvement of the parent or parents in the parent-child relationship threatens the life, safety, well-being, or physical, mental, or emotional health of the child irrespective of the provision of services. Provision of services may be evidenced by proof that services were provided through a previous plan or offered as a case plan from a child welfare agency.
In R.W.W. v. Department of Children & Families, 788 So.2d 1020(Fla. 2d DCA 2001), the child was born prematurely and had cocaine in its body. Within a week after having the baby, the mother was arrested for possession of cocaine. She had been on probation from an earlier cocaine charge. When the child was two months old and the mother was still incarcerated, *1251 DCF filed a petition for dependency and an order for termination. Like the case at bar, DCF did not offer the mother a case plan. The mother admitted to a five-year history of cocaine abuse and admitted to smoking marijuana on occasion. The mother also admitted to using cocaine and marijuana during the two weeks preceding the child's birth, including the use of cocaine the night before the child was born. She sought an opportunity to have a case plan with a goal of reunification. DCF contended that the mother's past refusal of drug counseling established she was not amenable to services and therefore no case plan was appropriate. Id.
In R.W.W. "[t]he trial court found that the Mother had tested positive for cocaine and that the cocaine may have contributed to the child's premature birth. The trial court also found that the Mother had a chronic substance abuse problem and lacked stable employment, stable income, and a stable residence at the time of the pregnancy and birth." Id. at 1022. However, in reversing the termination, the second district noted that the trial court did not comment on the mother's ability to comply with a case plan or whether a case plan with a goal of reunification should have been offered. This was error. The second district concluded "that the trial court's order is not based on record evidence, but rather is based on the trial court's speculation that the Mother would fail in any attempt to comply with a case plan with a goal of reunification. Such speculation is not a valid basis for terminating parental rights." Id.
DCF tries to distinguish the case at bar from R.W.W. on the basis that the mother in R.W.W. "[a]ppeared to be amenable to fundamental change for the better," while the mother in this case is "merely going through the motions." In support of this argument, DCF points to notes from the mother's parenting program. There are numerous weekly reports in the record taken during the mother's parenting course. Although DCF points to a few reports that were not positive, there are numerous positive notes regarding the mother's participation. There are notes from the counselor that report the mother was learning and notes complimenting the mother's involvement in the group.
The case at bar is akin to R.W.W. in that the trial court's finding that the mother was not amenable to services was based only on speculation. The final order of termination provides in relevant part as follows:
[T]he petition alleges that the mother was offered and did enter into a case plan for her older child, [R.B.], with which she failed to comply. It further alleged that she led a criminal lifestyle thereby rendering herself unable to care for [R.B.] or [T.B.] and that she has a history of substance abuse which interferes with her ability to parent. Petitioners proved that the mother did have a prior caseplan and failed to comply with it. They also proved that her decision to live a criminal lifestyle while pregnant with her first child has resulted in her inability to care for either child today or to complete a case plan in any meaningful or timely manner. As such, her continuing involvement in the parent child relationship threatened the wellbeing and the physical, mental, and emotional health of the child because there are no services which could be offered to ameliorate the situation which the mother's actions have created.
The final order makes clear that the trial court did not specify why it felt the mother was not amenable to services. In fact the order states that the mother's lifestyle has made her unable to care for *1252 her children today. Although the court also found that she would not be able to complete a case plan in any meaningful and timely manner, there is no explanation of why the court concluded as such. Many cases that come before this court involve parents who are incarcerated. This court has specifically recognized the difficulty an incarcerated parent has in completing certain tasks while incarcerated but has held that the parent's efforts must be considered in light of the opportunities available to that parent while incarcerated. T.C.S., 647 So.2d 1025.
In E.E.A. v. Department of Children & Families, 846 So.2d 1250 (Fla. 2d DCA 2003), the second district reversed a termination order where the court found there was no threat of harm where "[t]he only apparent threat of harm these children have suffered results from the instability of their placement, which, in turn, is the direct result of the Department's placement of the children with several foster care providers ...." Id. at 1252.
In E.E.A. the second district noted that the only harm the children had faced was due to their constant moving around. As a result, the court found there was no threat of harm from a continued relationship between the mother and the children. The court's analysis did not focus on the nature of the current relationship between the mother and the children. Further, there is testimony from the social worker in this case that T.N.B. is capable of forming a bond with someone she has never met.
This case is identical to E.E.A., in that the only harm alleged is harm based on T.N.B.'s instability. In addition, also like E.E.A., DCF is at least partially responsible for the instability. In E.E.A., the children were moved numerous times. In this case, T.N.B. remained at a shelter under the care of various people for the first nine months of her life.
The mother was released from prison on December 23, 2003. She has a sister who is willing to help her get back on her feet. There are positive comments in her file from counselors indicating she has made some progress. DCF has never met with this mother, nor has it offered her a case plan. The child is capable of forming a bond with someone she has never met before. The record is devoid of any evidence that the mother would not be amenable to services. The trial court's conclusion to the contrary appears to be improperly based on speculation. As a result, terminating the mother's parental rights was not the least restrictive means of protecting the child and we reverse the order of the trial court so that a case plan, with a goal of reunification, can be established.
III. Section 39.806(1)(d)3, Florida Statutes, Best Interests of Child
The mother also contends the trial court erred in terminating her parental rights under Florida Statute section 39.806(1)(d)3. Section 39.806(1)(d)3 permits the termination of an incarcerated parents rights when "[t]he court determines by clear and convincing evidence that continuing the parental relationship with the incarcerated parent would be harmful to the child and, for this reason, that termination of the parental rights of the incarcerated parent is in the best interest of the child."
The final order of termination provided that there was ample evidence to support termination on these grounds. The order provides in relevant part as follows:
Were the parent child relationship to continue, the child would have to wait for at least another year before she could achieve a permanent home. There is no guarantee that the mother would rehabilitate. After carefully considering the evidence and weighing the testimony *1253 of the witnesses, the Court determines that this mother's chances of rehabilitation is virtually non existent. She dismisses her first criminal charge of possession of cocaine with the intent to sell and states that she has no problem with drugs. She does not appear to understand the harm she has visited on her children by dealing in drugs. Nor does she exhibit any remorse over her multiple criminal thefts, other than perhaps feeling sorry for herself. Her own sister, who promised to be her sole support system when the mother is released from prison, seems woefully unaware of the mother's extensive drug and criminal history and seems to think this current incarceration is the result of the mother making one mistake. Since the mother is the sister's source of information, it appears that the mother also fails to appreciate the gravity of her deeds and the consequences they have wrought on her young children.
DCF points to R.M. v.Department of Children & Families, 847 So.2d 1103(Fla. 4th DCA 2003). In R.M., this court affirmed the termination of a father's rights. This court held that the statute does not require proof that actual contact is detrimental. In R.M., "DCF relied upon the testimony of the children's therapists to meet its burden in proving the father's continuing relationship was detrimental to the children. Each testified to the children's mental state, their present lack of a relationship with their father, and their need for permanency. They each stressed that the possibility of the father reclaiming his children after his incarceration would be extremely detrimental to the children's mental health." Id.
In the case at bar, the only medical testimony is from Dr. Robertson. Robertson acknowledged that he had not thoroughly examined T.N.B. He also described any problems he saw with T.N.B. as "fairly mild," and thought she could have an attachment issue. Although he testified on future harm to people with attachment problems, his testimony was regarding attachment problems in general, not specifically those of T.N.B. Further, the guardian ad litem testified that T.N.B. was doing very well. She was crawling and engaging. As a result, this case is distinguishable from R.M.
DCF "carries the burden not only to establish a ground for termination but the continuing substantial risk of harm to the current child." F.L. v. Dep't of Children and Families, 849 So.2d 1114 (Fla. 4th DCA 2003)(citing Padgett, 577 So.2d 565, 571 (Fla.1991)). "This means that [DCF] ordinarily must show that it has made a good faith effort to rehabilitate the parent and reunite the family, such as through a current performance agreement or other such plan for the present child." Id. at 1121.
In the case at bar, DCF did not make any effort to rehabilitate the mother and reunite the family. Based on the record before us, we do not find that DCF satisfied its burden to demonstrate that termination was the least restrictive way to protect this child. Nor did DCF establish by clear and convincing evidence that continuing the parental relationship with the mother would be harmful to the child.
IV. Egregious conduct
The mother also contends termination was improper based on alleged egregious conduct. Florida Statute section 39.806(1)(f) allows for parental rights to be terminated when: "the parent or parents engaged in egregious conduct or had the opportunity and capability to prevent and knowingly failed to prevent egregious conduct that threatens the life, safety, *1254 or physical, mental, or emotional health of the child or the child's sibling."
"[E]gregious conduct" means abuse, abandonment, neglect, or any other conduct of the parent or parents that is deplorable, flagrant, or outrageous by a normal standard of conduct. Egregious conduct may include an act or omission that occurred only once but was of such intensity, magnitude, or severity as to endanger the life of the child.
§ 39.806(f)(2), Fla. Stat. (2000).
The final order of termination found that termination, based on egregious abuse, was proper. The final order provides that "[i]t is outrageous for this woman who was medically furloughed only once in the past 2 years to get pregnant during that short furlough with another child she cannot possibly care for. The mother is repeating the behavior she exhibited only a year earlier with [R.B.]."
DCF reiterates that termination was proper because the mother abandoned the child. As discussed at length above, we disagree. The mother's incarceration does not justify a finding of abandonment. Nor does this record support an order terminating the mother's parental rights on that basis.
Further, there must be a nexus between the conduct and the abuse, neglect, or specific harm to the child in order to properly terminate parental rights based on a finding of egregious conduct. P.S. v. Dep't of Children & Family Servs., 863 So.2d 392 (Fla. 3d DCA 2003). In P.S., the second district reversed a termination order that was based on, inter alia, egregious conduct. The purported egregious conduct was the mother having been arrested in front of the child at the airport for attempting to smuggle cocaine into the country. In reversing the termination, the second district concluded that "[w]ithout connecting the arrest to any abuse, neglect or specific harm to the child that was present at the arrest or to her other children, this conduct alone cannot be the basis for a termination of parental rights." Id. at 394.
Similarly, this court has clarified that when termination is based on prospective abuse DCF must prove a nexus between the prior act of abuse and any prospective abuse. J.F. v. Dep't of Children & Families, 866 So.2d 81 (Fla. 4th DCA 2004).
In the case at bar, the conduct on which the trial court focused was the mother's conception of the child when she knew she was being sent back to prison. The injury to the child primarily is her attachment problems. As discussed above, the testimony regarding T.N.B.'s conditions are that they are fairly mild. Further, T.N.B.'s attachment problems are arguably more closely linked to DCF's placement of the child rather than the timing of T.N.B.'s conception.
It is axiomatic that this court defers to the trial court when evaluating the credibility of witnesses. This opinion does not challenge the trial court's superior vantage point in that regard. Nor does this opinion dispute the conclusions of fact made by the trial court. This court's reversal is based exclusively on the legal conclusions reached by the trial court based on the set of facts before us. Upon our review of the record, as a whole, we see a mother making an effort and demonstrating an overall intent to carry out a parent-child relationship. The mother expressed, and her sister confirmed, an awakening in this mother upon her having children. She has been released from prison, she has made some effort to be a parent and under the law is entitled to a reasonable opportunity to satisfy a case plan.
DCF failed to establish by clear and convincing evidence that the mother engaged *1255 in conduct which threatened the life, safety, or physical, mental, or emotional health of the child. In addition, the record does not show a connection between the conduct and the injury to the child.
For these reasons we reverse the order of the trial court and remand for proceedings consistent with this opinion.
MAY, J., concurs.
WARNER, J., dissents with opinion.
WARNER, J., dissenting.
I would affirm because the evidence supported termination based upon the court's determination that the incarcerated mother's continuing involvement with the child threatened her well-being and would be harmful to the child. There was evidence that C.B. had failed to complete a case plan with a prior child, and that she was still in prison and would need at least another year on a case plan before reunification with T.N.B. could be considered, leaving the child in foster care for at least two years. As the psychologist testified, that is a crucial time in a child's life, and the failure to bond with a permanent caregiver during that period would have lasting effects on the child.
In R.W.W. v. Department of Children & Families, 788 So.2d 1020 (Fla. 2d DCA 2001), relied on by the majority, the appellate court concluded that the trial court's determination that the mother was not amenable to services was simply speculation. This was because the mother herself testified to drug treatment she had completed in prison, and that she had been employed in the past and expected to be employed in a similar position upon release from prison, which supported her amenability to treatment.
In this case, there was more than speculation that the mother was not amenable to services. The mother does not have an employment history, has only a ninth grade education, and has a history of supporting herself by stealing and dealing drugs. While her sister said that she would help the mother upon release from prison, DCF had already investigated the sister and found that, because of juvenile charges against her son of a sexual nature, placement of T.N.B. with her would be inappropriate. Furthermore, C.B. had failed to complete a case plan for her older child while in prison. While she had taken some classes on parenting and anger management, a psychologist who reviewed her records testified that her deficit in skills and abilities together with her criminal background "would be pretty devastating to the probability that she can establish a secure, stable environment for herself and then include her child." The psychologist also explained that T.N.B. had developmental delays that he attributed to a lack of attachment due to the sheltered care setting. While rehabilitation of C.B. might occur, given the year delay already, the additional fifteen months would cause a whole host of problems for T.N.B. in physical, cognitive, and emotional development if she were unable to develop a solid bond with a caregiver.
Particularly considering the psychologist's testimony, I think the evidence was competent, substantial, and sufficient to support the trial court's ruling terminating C.B.'s parental rights, given the effect the additional delay required for C.B. to rehabilitate herself after prison will have upon the child.