DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**A.S.**, the Father,
Appellant,

v.

**DEPARTMENT OF CHILDREN & FAMILIES, J.A.**, and **GUARDIAN AD LITEM PROGRAM**,
Appellees.

No. 4D14-3571

[April 1, 2015]

Appeal from the Circuit Court for the Fifteenth Judicial Circuit, Palm Beach County; Kathleen J. Kroll, Judge; L.T. Case No. 2012DP300395 JL.

Frank A. Kreidler, Lake Worth, for appellant.

Rosemarie Farrell, Orlando, for appellee DCF.

Jorge Anton, Attorney Ad Litem, Legal Aid Society of P.B. County, Inc., West Palm Beach, for appellee J.A.

Patricia M. Propheter, Sanford, for appellee Guardian Ad Litem Program.

STEVENSON, J.

The case before us arises from the termination of parental rights of A.S., the father. We find the trial court erred in finding that A.S. abandoned his child and that termination of his parental rights was the least restrictive means available. Accordingly, we reverse and remand for further proceedings.

*Facts*
A.S. and the mother of J.A., the child, had a brief relationship, during which the mother became pregnant but was uncertain as to the father. A.S. knew the mother was pregnant and that he might be the father. Still, he did not believe the mother when she notified him and had no further contact with her throughout her pregnancy.

J.A. was born in September of 2012. He was sheltered almost immediately and was placed in licensed care.[1] In December of 2012, DCF filed a petition for termination of parental rights as to both of J.A.'s parents on the basis of abandonment. The petition listed the father of the child as "unknown." J.A. was adjudicated dependent in January of 2013.

The mother has played an almost non-existent role in J.A.'s life, and a termination of parental rights has been entered against her. The mother provided DCF, over the course of a few months, three names of possible fathers. Two men took paternity tests within a few months of J.A.'s birth. Neither man was J.A.'s father.

By late February of 2013, more than six months after J.A.'s birth, the mother testified in open court that A.S. was the father.[2] Testimony from the TPR hearing established that a case manager with DCF contacted A.S. The case manager spoke to A.S. once in March of 2013, but was unable to speak at length because he was at work. In addition to speaking with A.S. by phone, the case manager e-mailed him information about taking a paternity test.

A hearing on a motion to establish paternity was scheduled for March 20, 2013. DCF served notice of the hearing on someone who lived at A.S.'s listed address, but A.S. failed to appear. A.S. also missed two paternity test appointments scheduled by DCF—one in April of 2013 and the other in May of 2013. DCF had sent letters to A.S.'s listed address, notifying him of these appointments. A.S. later explained that he lived with his grandparents at their home and that he used his listed address as a rental property. He claimed he never received the notice or letters from his tenant.

DCF eventually located A.S., and he took a paternity test in August of 2013. A.S. did not learn he was the father until the December 2013 hearing. When asked why he did not contact the testing company to discover the paternity result, A.S. said he assumed he would have been contacted had the test shown he was the father.

According to the record before us, the test result proving A.S.'s

---

[1] At the time of the July 2014 TPR hearing, J.A. was living with foster parents.

[2] In a January 23, 2013 order, there was a note from the case manager that the mother had named A.S. and another man as possible fathers; however, the case manager wrote that the man initially identified was still listed as the father in DCF's computer system.

2

paternity was filed with the trial court on October 2, 2013. On November 25, 2013, DCF filed an amended petition for termination of parental rights against the mother and A.S. The basis for termination against A.S. was abandonment. By the end of 2013, A.S.'s paternity was established and he was officially a party to the case, but he was never offered a case plan.

After learning he was the father, and missing a scheduled mediation in January of 2014, A.S. took steps to begin forming a relationship with J.A. A.S. first met J.A. in late March of 2014. Seven subsequent visits followed, with each visit lasting approximately an hour-and-a-half and generally taking place at a park. Three other scheduled visits were canceled because the case manager was on vacation. A.S. purchased food for J.A. during these visits, and brought J.A. a toy on one occasion.

There was conflicting testimony at the TPR hearing concerning the impact these visits had on J.A. The foster mother testified that J.A. had night terrors following his visits with A.S. She further testified that J.A. often returned home with a dirty diaper, which she attributed to A.S.'s failure to check J.A.'s diaper before dropping him off with the case manager. A.S. disputed the foster mother's testimony, asserting that he always checked J.A.'s diapers during their visits.

The trial court entered an order terminating A.S.'s parental rights, finding the evidence was clear and convincing that A.S. abandoned J.A. as defined in section 39.01(1), Florida Statutes (2014), and within the meaning of section 39.806(1)(b), Florida Statutes (2014).[3] The trial court further concluded that termination was the least restrictive means available, as reunification with A.S. would, in its opinion, pose a substantial risk of significant harm to J.A.

*Analysis*

*Abandonment*
We first address the trial court's finding that A.S. abandoned J.A. "Abandonment," in the context of a termination of parental rights case, is

---

[3] Section 39.806(1)(b), Florida Statutes (2014), provides:

> (1) Grounds for the termination of parental rights may be established under any of the following circumstances:
> . . . .
> (b) Abandonment as defined in s. 39.01(1) or when the identity or location of the parent or parents is unknown and cannot be ascertained by diligent search within 60 days.

defined as:

> [A] situation in which the *parent* or legal custodian of a child or, in the absence of a parent or legal custodian, the caregiver, while being able, has made no significant contribution to the child's care and maintenance or has failed to establish or maintain a substantial and positive relationship with the child, or both. For purposes of this subsection, "establish or maintain a substantial and positive relationship" includes, but is not limited to, frequent and regular contact with the child through frequent and regular visitation or frequent and regular communication to or with the child, and the exercise of parental rights and responsibilities. Marginal efforts and incidental or token visits or communications are not sufficient to establish or maintain a substantial and positive relationship with a child.

§ 39.01(1), Fla. Stat. (2014) (emphasis added). Chapter 39 defines a "parent" as:

> [A] woman who gives birth to a child and a man whose consent to the adoption of the child would be required under s. 63.062(1). If a child has been legally adopted, the term "parent" means the adoptive mother or father of the child. *The term does not include . . . an alleged or prospective parent, unless the parental status falls within the terms of s. 39.503(1) or s. 63.062(1).*

§ 39.01(49), Fla. Stat. (2014) (emphasis added).

When reading the definition of "parent" in conjunction with that of "abandonment," we conclude that a *prospective* parent cannot abandon a child under Chapter 39, unless the prospective parent's status falls within the terms of sections 39.503(1) or 63.062(1).[4] *See Heart of Adoptions, Inc. v. J.A.*, 963 So. 2d 189, 198 (Fla. 2007) ("As with any case of statutory construction, we begin with the 'actual language used in the statute.'") (quoting *Borden v. East-European Ins. Co.*, 921 So. 2d 587, 595 (Fla. 2006)).

---

[4] Section 39.503, Florida Statutes (2014), illustrates the proper procedure a trial court should follow when the identity or location of a parent is unknown and a *dependency* petition has been filed. Section 63.062(1), Florida Statutes (2014), lists persons who are required to consent to an adoption.

In making this determination, we have considered the legislature's finding "that time is of the essence for establishing permanency for a child in the dependency system." § 39.0136(1), Fla. Stat. (2014). Our resolution of this case is not at odds with the legislature's intent of timely establishing permanency as the trial court and DCF have set procedures to expedite petitions for termination of parental rights. Section 39.803, Florida Statutes (2014), prescribes the inquiry the trial court must make when the identity or location of a parent is unknown and a petition for termination of parental rights has been filed. More importantly, this section requires the trial court to direct DCF to conduct a diligent search for the prospective parent if the prospective parent's location is unknown.[5] If DCF complies and a diligent search fails to locate a prospective parent, then DCF can proceed with a petition for termination of parental rights without concern that the TPR could be later undermined by the appearance of a prospective parent seeking to establish his or her parental rights.

Neither section 39.503(1) nor section 63.062(1) is applicable to the instant case, and there is no evidence that DCF ever utilized section 39.803 to locate A.S. Therefore, A.S. was a prospective parent until his paternity was established. A.S.'s paternity was established, at a minimum, towards the end of 2013, not the beginning of 2013. Thus, in deciding whether A.S. abandoned J.A., the trial court should have considered only A.S.'s actions following his established paternity. The trial court, however, erroneously relied on A.S.'s failure to take affirmative steps to establish his paternity in the early- to mid-months of 2013.

Looking at only A.S.'s actions after the establishment of his paternity, we find the trial court was not presented with clear and convincing evidence that he abandoned J.A. *See T.G. v. Dep't of Children & Families*, 8 So. 3d 1198, 1199 (Fla. 4th DCA 2009) ("To terminate parental rights because of abandonment, there must be clear and convincing evidence."). From March of 2014 to the July 2014 TPR hearing, A.S. visited J.A. eight times. Combining these eight visits with the three visits that were canceled by the case manager, A.S. was on pace to see his son on a weekly basis.

---

[5] Section 39.803(8), Florida Statutes (2014), provides:

> If the inquiry and diligent search identifies a prospective parent, that person must be given the opportunity to become a party to the proceedings by completing a sworn affidavit of parenthood and filing it with the court or the department. A prospective parent who files a sworn affidavit of parenthood while the child is a dependent child but no later than at the time of or prior to the adjudicatory hearing in the termination of parental rights proceeding for the child shall be considered a parent for all purposes under this section.

This established pace constitutes "frequent and regular contact with the child." § 39.01(1), Fla. Stat. (2014); *see also S.L. v. Dep't of Children & Families*, 120 So. 3d 75, 77 (Fla. 4th DCA 2013) (reversing on the issue of abandonment when there was evidence that the mother visited her children twenty-six times in a one-year time period, had other visits with the children that were not documented, and purchased clothing, food and other items for them).

Based on our conclusions that A.S. was a prospective parent until late 2013 and could not have abandoned his child until his paternity was established, and that the trial court was not presented with clear and convincing evidence that A.S. abandoned J.A. following the establishment of paternity, we find the trial court erred in finding A.S. abandoned J.A.

*Least Restrictive Means*
We next address why termination of A.S.'s parental rights was not the least restrictive means available. DCF's concession on this issue is well taken.

To prove that termination of parental rights is the least restrictive means of protecting a child from harm, DCF "'must show by clear and convincing evidence that reunification with the parent poses a substantial risk of significant harm to the child.'" *A.H. v. Dep't of Children & Families*, 144 So. 3d 662, 665 (Fla. 1st DCA 2014) (quoting *B.C. v. Fla. Dep't of Children & Families*, 887 So. 2d 1046, 1053 (Fla. 2004)). "'[T]he least restrictive means test [is not] intended to preserve the parental bonds at the cost of a child's future. Instead, this test requires that those measures short of termination should be utilized if such measures can permit the safe reestablishment of the parent-child bond.'" *L.W. v. Dep't of Children & Families*, 71 So. 3d 221, 224 (Fla. 4th DCA 2011) (quoting *A.J. v. K.A.O.*, 91 So. 2d 30, 33 (Fla. 5th DCA 2007)) (internal quotation marks omitted).

"Florida's governing statutes clearly state that when DCF seeks to terminate parental rights due to abandonment, it need *not* offer the parent a case plan with a goal of reunification." *C.A.H. v. Dep't of Children & Families*, 830 So. 2d 939, 941 (Fla. 4th DCA 2002). In general, however, DCF "ordinarily must show that it has made a good faith effort to rehabilitate the parent and reunite the family, such as through a current performance agreement or other such plan for the present child." *Padgett v. Dep't of Health & Rehabilitative Servs.*, 577 So. 2d 565, 571 (Fla. 1991). Further, "in order to establish that termination is the least restrictive means, DCF must show that the parent will not benefit from court ordered services." *C.A.T. v. Dep't of Children & Families*, 10 So. 3d 682, 684 (Fla. 5th DCA 2009).

6

In the instant case, A.S. was never offered a case plan, despite no indication in the record that he was unable to comply with a case plan or that J.A. would suffer significant harm were he reunited with A.S. The attorney ad litem argues that there was no requirement to offer a case plan to A.S., and cites *C.A.H.* for support. In *C.A.H.*, this court upheld a trial court's decision to terminate a mother's parental rights even though she had not been offered a case plan. *C.A.H.*, however, is distinguishable. There, the mother knew the location of her child but failed to visit the child for close to eight months, and she was repeatedly incarcerated. 830 So. 2d at 939–40.

Unlike the mother in *C.A.H.*, once A.S. discovered he was J.A.'s father, he frequently visited his child and expressed an interest in playing a larger role in his life. Aside from testimony about dirty diapers and occasional night terrors, there was no additional evidence that J.A. would suffer harm if reunited with A.S. Accordingly, we find the trial court was not presented clear and convincing evidence that termination of parental rights was the least restrictive means available.

*Conclusion*

Based on the forgoing, we reverse the order of termination as to A.S. and remand to the trial court for further proceedings.

*Reversed and remanded.*

MAY and KLINGENSMITH, JJ., concur.

*     *     *

**Not final until disposition of timely filed motion for rehearing.**