IN THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FIFTH DISTRICT

NOT FINAL UNTIL TIME EXPIRES TO
FILE MOTION FOR REHEARING AND
DISPOSITION THEREOF IF FILED

C.C., FATHER OF L.A., A CHILD,

      Appellant,

v.

Case No.  5D22-1476
LT Case No. 2017-DP-000117-SH

DEPARTMENT OF CHILDREN AND FAMILIES,

      Appellee.

_____/

Opinion filed November 14, 2022

Appeal from the Circuit Court
for Osceola County,
Laura Shaffer, Judge.

Ryan Thomas Truskoski, of Ryan
Thomas Truskoski, P.A., Orlando,
for Appellant.

Kelley Schaeffer, of Children's Legal
Services, Bradenton, for Appellee,
Department of Children and
Families.

Sara Elizabeth Goldfarb, Statewide
Director of Appeals, and Desiree
Erin Fernandez, Senior Attorney, of
Statewide Guardian ad Litem Office,
Tallahassee, and Blake Lynne

Bruce, of Defending Best Interests
Project, Alexandria, VA, for
Appellee, Guardian ad Litem
Program.

COHEN, J.

C.C. ("Father") appeals the order terminating his parental rights to L.A. ("the child").[1] Father argues that there was not competent substantial evidence that termination was the least restrictive means of protecting the child. We agree.

This case involves competing principles found in many termination of parental rights cases: the constitutional right of a parent to raise his or her child and the right of the child to permanence and stability. Courts have long recognized the fundamental liberty interest of parents in determining the care and upbringing of their children. Padgett v. Dep't of HRS, 577 So. 2d 565, 570 (Fla. 1991). This interest is particularly strong under the Florida Constitution. S.M. v. Fla. Dep't of Child. & Fams., 202 So. 3d 769, 777–78 (Fla. 2016) ("[T]his fundamental right is equally as strong, if not stronger, under the Florida Constitution."). However, that interest is not absolute; the best interests of the child prevail. Padgett, 577 So. 2d at 570 ("[T]he only limitation on this rule of parental privilege is that as between the parent and the child the ultimate welfare of the child itself must be controlling." (citation omitted)).

Born in Osceola County in December of 2017, the child was sheltered after

---

[1] The termination of the mother's parental rights was affirmed by this Court in a separate case.

his mother was arrested for physical abuse of her eldest child. Father resided in North Carolina at the time of the child's birth. The mother consented to the child's dependency, while Father did not. Instead, Father requested that the child be placed with him. The Department of Children and Family Services ("the Department") moved for an expedited placement with Father, dismissed the dependency petition as to him without prejudice, and ordered a home study. Upon Father's request, the Department assigned several voluntary tasks to him, including completion of individual counseling, parent coaching, and a psychological evaluation—which Father completed.

The home study, performed in North Carolina, was negative because of Father's criminal history. The Department was informed that there was nothing Father could do to obtain a positive home study in North Carolina. Additional services were not ordered for Father, although reunification remained the goal; instead, the Department recommended that he secure an apartment in Florida to potentially obtain a positive home study, and Father made some attempt towards that goal.

At six months old, the child was placed with a non-relative, with whom the child still resides; the child is now almost five. Between incarcerations, Father visited the child through video calls two to three times per week, supervised by the caregiver, and travelled to Florida on multiple occasions to visit the child.

Father was unable to effectuate a move to Florida when he became incarcerated. Father's criminal history includes an arson and assault conviction that

predated the birth of the child by twelve years. However, Father has been in and out of jail during the pendency of this case. Father is currently incarcerated with an anticipated release date of September 2023.

Father was arrested in North Carolina for DWI in August 2018, and not long after, the Department filed an amended petition for supplemental findings of dependency relating to Father, alleging impending danger to the child, prospective neglect, and prospective abuse, which Father denied. The Department noted the recent arrest and Father's criminal history preceding the child's birth, as well as reports of domestic violence involving Father. At that point in time, the child had not been adjudicated dependent as to Father. The Department also moved to place the child in a permanent guardianship with the caregiver, noting that adoption was not appropriate given Father's engagement in services as well as his provision of money, clothing, diapers, and food for the child. The court responded by ordering a goal of permanent guardianship concurrent with a goal of reunification, and also ordered that the Department file an amended case plan within 30 days to include proposed tasks for Father. That plan was never generated.

During this time, Father had been sentenced to 18 months on the DWI charge.[2] After serving seven months, he was released into a voluntary substance abuse treatment program. One week later, the Department filed an expedited petition

---

[2] The offense predated the child's birth; the sentence did not.

4

for involuntary termination of Father's parental rights. The petition alleged: (1) chronic substance abuse; (2) abandonment; and (3) continued involvement threatens the child irrespective of services. In January 2020, after completing the treatment program, Father resumed his virtual visits twice per week.

The TPR trial was conducted piecemeal over a span of ten months. The trial court initially denied the Department's petition. However, after a motion for rehearing filed by the Guardian Ad Litem ("GAL"), the trial court reversed itself and ordered a new trial sua sponte, noting that, because the trial transpired over nearly a year during the pandemic, the case should be tried again "in fairness to the parties."

The court ordered Father to undergo an updated psychological evaluation. Father requested that the evaluation be scheduled in North Carolina or, alternatively, that the Department assist with his travel to Florida for an appointment there. The Department did not respond, so Father offered to participate in the evaluation in Florida during a trip in May 2021 to visit the child.

Shortly before the trip, Father was again incarcerated and has not seen the child since. Several months later, the Department filed an amended expedited TPR petition, retaining the original grounds but adding a fourth ground, that the child was in out-of-home care for 12 out of the past 22 months.

At trial, the GAL testified that, prior to his incarceration, Father travelled to Florida for in-person visits three to four times per year and had video visits with the

5

child as well. He had provided clothing for the child around the holidays; would check throughout the year on the child's needs; provided diapers when asked; signed parental consents for medical procedures; and paid a portion of the funds for the child's daycare. The GAL expressed concerns about the child's safety with Father given his "very long prior history of criminal involvement" and "ongoing issues with substance abuse" but conceded that Father had never been provided a case plan.

Father testified remotely from prison in North Carolina. He acknowledged his criminal history including his current incarceration for possession of a firearm by a felon, communicating threats and assault by pointing a weapon, and violation of probation by resisting a public officer. His plan following his release was to transfer his parole to Florida and resume the relationship with his child.

Father testified that in addition to completing the counseling services and psychological evaluation after referrals were provided in 2018, he also took an anger management class and followed other recommendations made by the psychologist. He stated that he worked to better himself while incarcerated by completing his GED, obtaining an HVAC diploma, and attending the substance abuse program as well as associated 12-step meetings. He had not heard from his case manager for almost one year, since his incarceration in May 2021.

The case manager admitted that she had not made any referrals to overcome concern about Father's substance abuse after he completed the voluntary treatment

program, such as drug testing. She also explained that the updated psychological evaluation was ordered while the case was in a TPR posture so that the Department could determine whether it wanted to move forward with the TPR trial or not; but there was no follow-up to obtain the evaluation once Father missed the appointment in Florida.

The trial court entered final judgment terminating Father's parental rights on the basis of (1) abandonment, (2) continuing involvement threatens the child irrespective of services, and (3) the child having been in care for 12 of the last 22 months, pursuant to section 39.806(1)(b), (1)(c), and (1)(e)3., Florida Statutes (2021), respectively. The majority of the court's findings addressed his criminal history. After noting that Father did not have a case plan, the trial court added that "he did participate in some services but it did not stop the criminal behavior and it did not stop him from being repeatedly incarcerated."

As to the least restrictive means of protecting the child, the trial court found that "[t]he child was sheltered four and a half years ago" and proceeded to find, in a conclusory fashion, "The Department has made reasonable efforts. Neither parent is able to be safely reunified with the child."

Father argues on appeal that the Department failed to prove that the termination of his parental rights was the least restrictive alternative when he was never provided a case plan and had never harmed the child.[3]

---

[3] We note the assertion in the Department's brief that Father <u>had</u> been given

The least restrictive means test is a judicially imposed requirement that "is tied directly to the due process rights that must be afforded to a parent before his or her parental rights are terminated." S.M., 202 So. 3d at 778. However, the test "is not intended to preserve a parental bond at the cost of a child's future. Rather . . . it simply requires that measures short of termination should be utilized if such measures can permit the safe re-establishment of the parent-child bond." Id. at 778–79 (citation omitted). The least restrictive means analysis focuses on the actions taken by the Department to ensure that a parent is provided fair procedures before the termination of parental rights. Id. at 778 ("This prong focuses specifically on what actions were taken by the State before filing a petition to terminate the parent's rights."). In order to meet the requirement, the Department must show that it has made a good faith effort to rehabilitate the parent and to reunify the family. K.D. v. Dep't of Child. & Fams., 242 So. 3d 522, 523–24 (Fla. 1st DCA 2018). Generally, this prong is satisfied by the Department offering the parent a case plan and providing the parent with the help and services necessary to complete the case plan. Id. However, a case plan is not necessarily a mandatory prerequisite to termination. Id. at 524. Even so, a petitioner's burden to prove that termination is the least restrictive means of protecting a child from harm is not eliminated.

Beginning with an analysis of the Department's efforts to rehabilitate Father

a case plan. Both the testimony of the GAL and the findings made by the trial court demonstrate the inaccuracy of that assertion.

8

and reunify him with the child, for the four years from the shelter petition to the filing of the amended TPR petition, little was done, despite the Department's undisputed awareness from the outset that Father had a criminal history and substance abuse issues. The Department provided—at Father's request—some initial voluntary counseling, one psychological evaluation, and two home studies. The Department did not provide: (1) a formal case plan and associated services that would provide Father with an opportunity to prove his capability; (2) an updated psychological evaluation; (3) substance abuse treatment or drug screening, despite diagnosed and admitted alcoholism, and the Department's allegation of chronic substance abuse; or (4) any contact or services while incarcerated or between the two incarcerations. In other words, the Department expended minimal efforts during the over-two years that Father was not incarcerated and none while he was incarcerated. This lack of effort does not suffice as having provided Father with "fundamentally fair procedures" before terminating his parental rights. See S.M., 202 So. 3d at 778.

In addition, the evidence presented did not demonstrate Father would not benefit from services, for several reasons. See C.A.T. v. Dep't of Child. & Fams., 10 So. 3d 682, 684–85 (Fla. 5th DCA 2009) ("[I]n order to establish that termination is the least restrictive means, DCF must show that the parent will not benefit from court ordered services."); L.C.A. v. Dep't of Child. & Fams., 319 So. 3d 671, 678 (Fla. 3d DCA 2021); A.S. v. Dep't of Child. & Fams., 162 So. 3d 335, 340 (Fla. 4th DCA 2015). First, the GAL testified that there are services for incarcerated parents

that are intended to reduce recidivism, which the GAL simultaneously noted was the State's primary concern for Father. Second, no updated psychological evaluation was conducted, despite Father's willingness to submit to one. See In re E.R., 49 So. 3d 846, 859–60 (Fla. 2d DCA 2010) (holding that termination was least restrictive means when court could not determine whether mother had mental health problem that would prevent her from benefitting from court-ordered services, because mother refused to discuss her other child's mysterious death, rendering psychological evaluation incomplete). And more significant, the GAL testified that the results of the updated evaluation would inform the Department's determination whether to file the TPR at all; yet, the evaluation was never conducted. Third, there was also no evidence that supervised visitation would be harmful to the child while Father engaged in such services, as harm was never reported in their 100-plus visits together. See C.A.T., 10 So. 3d at 685; cf. R.W. v. Dep't of Child. & Fams., 228 So. 3d 730 (Fla. 5th DCA 2017) (determining parent not amenable to court-ordered services where there was "absolutely no reasonable basis to believe [the mother] will improve").

Finally, Florida courts consider a parent's efforts at rehabilitation when determining if termination is the least restrictive means. See generally J.J. v. Dep't of Child. & Fams., 994 So. 2d 496 (Fla. 4th DCA 2008) (where termination not least restrictive means when mother, who was previously convicted of aggravated child abuse of another child, engaged in voluntary counseling, parenting classes, and

10

regular visitation of subject twins but was not provided case plan); <u>V.M. v. Dep't of Child. & Fams.</u>, 922 So. 2d 1085 (Fla. 4th DCA 2006) (where Department did not demonstrate reasonable efforts toward reunification for father who, for seven months between incarcerations: regularly visited child, attended a court hearing, and completed one voluntary task); <u>cf.</u> <u>R.K. v. Dep't of Child. & Fams.</u>, 898 So. 2d 998 (Fla. 5th DCA 2005) (where termination was least restrictive means for mother with 15-year history of drug abuse and criminal activity, plus prior removal of another child, who left substance abuse program prior to completion and refused Department's offer of voluntary services). Here, Father requested voluntary services, which included counseling and a psychological evaluation, completed all of them as soon as they were referred, and continued with individual counseling. Additionally, as part of his sentence for DWI, he completed a substance abuse treatment program. After his home study was negative and unlikely to change, he pursued relocation to Florida, driving back and forth to secure an apartment, while also working toward placement of the child with a friend in North Carolina. When the court ordered an updated psychological evaluation and the Department would not arrange it in North Carolina, he made arrangements to travel to Florida—without assistance from the Department—to complete it. While incarcerated, he obtained his GED diploma and HVAC certification, and he attended 12-step meetings for substance abuse. In addition, it is undisputed that Father had video visits with the child two to four times per week prior to his first incarceration, resumed that practice after incarceration,

11

and also travelled to Florida to visit the child in person.

Clearly the trial court was concerned with Father's criminal history. Appellees contend that additional services would not remedy the essential problem of Father's criminal propensities, a history that prohibits safe reunification, but Appellees provide no authority connecting a parent's criminal history with an inability to benefit from court-ordered services. Instead, Appellees largely rely on S.M., 202 So. 3d 769, where the Florida Supreme Court found the least restrictive means test met, concluding that "the material facts in the underlying termination of parental rights trial . . . demonstrate the extensive efforts made by the Department to reunify the mother with her children before it filed a petition to terminate parental rights." Id. at 773. The extensive efforts included three case plans plus four years of services. Id. at 783. But the mother refused to comply, did not visit the children on a regular basis, routinely missed court hearings, and conceded that reunification would be harmful to the children. Id. at 772–74. The instant case does not reflect such efforts by the Department or non-compliance by Father.

That same history was utilized in the trial court's analysis of whether the child could be safely reunified with Father. At trial, the bulk of the State's questions concerned Father's criminal history. The only exhibit entered by the State as to him was Father's judgment and sentence from the 2005 arson case, and Father's criminal history comprised the majority of the trial court's findings. However, Father has no history of harming children in general or this child in particular.

We recognize that time is of the essence in permanency cases and that, while Father never harmed the child, the instability of impermanency itself can cause harm. S.M., 202 So. 3d at 781 ("The Legislature has also made clear that '[t]ime is of the essence' in providing permanency for children requiring that, if possible, children should be placed in a permanent living situation within one year of coming into care." (citation omitted)); see B.K. v. Dep't of Child. & Fams., 166 So. 3d 866, 876–77 (Fla. 4th DCA 2015) (recognizing that harm can arise from continued instability in child's life).

Here, the child has never been in Father's custody and instead has been with the same caregiver for the four years preceding the trial, a caregiver who has expressed an interest in adopting him. However, much of the delay was outside of Father's control. Father pursued custody immediately and requested a home study, then pursued two other options as soon as the home study was negative. He completed his voluntary tasks promptly upon referral and resumed visitation as soon as he was released from jail. As noted by the trial court, the first TPR trial was protracted for close to one year due the pandemic—and then further delayed when, after finding that the Department had not established grounds for termination of parental rights, the trial court sua sponte granted a new trial that did not commence until one year later. As such, this is not a case of a child enduring impermanency while waiting for a slow-moving parent to demonstrate responsibility by completing one—or multiple—case plans.

In sum, cases permitting termination of parental rights without the provision of a case plan generally involve extraordinary circumstances. S.M., 202 So. 3d at 778 ("The determination of the least restrictive means must be evaluated in light of the right being terminated: to be a parent to one's child. Consideration of this prong is all the more critical in the extraordinary case, where the Department does not offer the parent the chance to comply with the requirements of a case plan and be reunited with his or her child . . . ."). This Court has articulated specific examples of such extraordinary cases:

> [O]ur supreme court has recognized, in certain "extraordinary circumstances," termination of parental rights without the use of a case plan is the least restrictive means to protect a child. <u>Those extraordinary circumstances include severe or continuing abuse through continuing involvement and egregious abuse</u> as found in then section 39.464, paragraphs (3) and (4), now renumbered as section 39.806(1)(c) and (1)(f).

R.W., 228 So. 3d 730 at 733 (relying on In re T.M. & F.M., 641 So. 2d 410, 413 (Fla. 1994)) (emphasis added); see also In Int. of X.W., 255 So. 3d 882, 890 (Fla. 2d DCA 2018) ("We are confident that in cases like this one—involving the sexual battery of an eleven-year-old resulting in the conception of a child—such extraordinary circumstances exist.").

Under the facts of this case, and in the absence of other reasonable efforts at reunification, a case plan should have been provided to Father, with the opportunity to perform satisfactorily thereunder, before DCF pursued severance of his parental rights. See S.M., 202 So. 3d at 777–78. Accordingly, there was not competent

14

substantial evidence that termination was the least restrictive means of protecting the child.

REVERSED and REMANDED.

SASSO and WOZNIAK, JJ., concur.